Frank J. OSTROFE, Plaintiff-Appellant,

v.

H. S. CROCKER COMPANY, INC., Defendant-Appellee.

No. 77–3985.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 20, 1980.

Decided March 8, 1982.

Rehearing and Rehearing En Banc Denied May 6, 1982.

As Amended May 21, 1982.

Darrell J. Salomon, San Francisco, Cal., argued, for plaintiff-appellant; Alioto & Alioto, San Francisco, Cal., on brief.

James T. Fousekis, Steinhart, Goldberg, Feigenbaum & Ladar, San Francisco, Cal., argued, for defendant-appellee.

Before BROWNING, Chief Judge, and KENNEDY and SKOPIL, Circuit Judges.

BROWNING, Chief Judge:

The principal issue presented by this appeal is whether under the circumstances of this case a sales manager, forced to resign because he refused to participate in an alleged scheme by his employer and other manufacturers to fix prices, rig bids, and

allocate markets, has standing to bring a private treble damages action against his employer under Section 4 of the Clayton Act. We hold that he does.

## I.

Frank J. Ostrofe, former marketing director of H. S. Crocker Company, Inc., filed a complaint against Crocker seeking damages for injuries resulting from a violation of the Sherman Act. The complaint alleged the following: Crocker and other unnamed manufacturers of paper lithograph labels combined and conspired to unreasonably restrain interstate trade and commerce in labels in violation of Section 1 of the Act. The conspiracy consisted of a continuing agreement and concert of action among the manufacturers to fix and maintain label prices, submit rigged bids, allocate customers and territories, and "boycott those persons, including plaintiff, who have interfered or threatened to interfere with their illegal plan."[1] The conspiracy was effectuated in part by coercing Ostrofe, as Crocker's sales manager, to rig bids, fix prices, and allocate markets. When Ostrofe refused to cooperate Crocker's co-conspirators complained to Crocker's executive officers who warned Ostrofe that if he did not participate in the illegal scheme he would be discharged and prevented from participating in the label industry in the future. Ostrofe was repeatedly told he would not receive promised financial compensation or a greater future share in Crocker's management or income unless he stopped interfering with the unlawful scheme. He was forced by these threats to resign his position with Crocker, and was boycotted from further employment in the labels industry.

Crocker moved to dismiss on the ground Ostrofe lacked "standing" to sue for damages under Section 4 of the Clayton Act. The district court granted the motion in part, holding Ostrofe could not attack the agreement to fix prices because he was not the "target" of that agreement. The court said, "[T]he conspiracy was directed not at plaintiff or other employees in any anti-competitive sense or even at his employer, but only at competitors of the conspirators in the lithograph label market. Any effect upon plaintiff was not an effect of the alleged anti-competitive conduct but at most an alleged incidental effect upon an employee who eventually refused to continue participation in the conspiracy."

The court noted, however, that the complaint also alleged an understanding among Crocker and the other label manufacturers to boycott Ostrofe and others who interfered with the price fixing activities, and held that Ostrofe had standing to challenge this "separate" conspiracy. The court therefore denied the motion to dismiss with respect to this claim "without prejudice, however, to a properly documented motion for summary judgment presenting the [boycott] issue."

Crocker filed a motion for summary judgment supported by depositions and affidavits negating the existence of any agreement among label manufacturers not to employ plaintiff. In opposition to the motion, Ostrofe offered affidavits supporting his allegations that other label manufacturers had complained to Crocker about Ostrofe's failure to implement the price-fixing agreement, that Crocker had threatened Ostrofe with reprisals if he did not participate in the price-fixing scheme, and that these threats had forced Ostrofe's resignation from Crocker. Crocker responded, in part, that Ostrofe's evidence related to activities that had allegedly occurred prior to Ostrofe's resignation, and therefore "do not relate to the claimed boycott but rather to the alleged price fixing conspiracy, as to which [Ostrofe] has no standing to complain."

While the motion for summary judgment was pending, Ostrofe moved to amend the complaint to specifically allege a unilateral refusal by Crocker to deal with Ostrofe.

1. *See United States v. H. S. Crocker Co.,* 1978 1 Trade Cases ¶ 61,883 (N.D.Cal.1976) and *United States v. H. S. Crocker Co.,* 1975–2 Trade Cases ¶ 60,615 (N.D.Cal.1975).

The proposed amendment alleged that the "conspiracy to fix prices . . . and allocate markets has been effectuated in part by defendant [Crocker] terminating plaintiff as a national sales manager for paper labels when plaintiff failed to cooperate in the aforesaid conspiracy." The district court denied the motion to amend, stating, "To allow the proposed amendment would, in effect, be to allow [Ostrofe] to complain of the alleged price-fixing conspiracy, since [Ostrofe] would be required to show at trial the existence of such a conspiracy in order to prove that the unilateral action was unlawful. If we were to allow the amendment, we would be granting [Ostrofe] standing to complain of the price-fixing conspiracy, which was previously denied."

The district court later granted the motion for summary judgment without opinion, and dismissed the action.

## II.

The district court erred in deciding Crocker's motions to dismiss and for summary judgment as if Ostrofe's claim consisted of two separate and unrelated lawsuits— one challenging a conspiracy to fix prices and allocate customers for paper lithograph labels, the other attacking an agreement to terminate and bar Ostrofe from employment in that industry.

■ It is axiomatic that the allegations of a complaint must "be read as a whole, and . . . viewed broadly and liberally." Wright and Miller, 5 Fed.Practice and Procedure, 657. The same view must be taken of plaintiff's proof: "In cases such as this, plaintiff should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '. . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).[2]

The fragmentation of Ostrofe's pleading and proof lead to erroneous rulings on the motions to dismiss, to amend the complaint, and for summary judgment.

### A. Motion to Dismiss

The court treated the motion to dismiss for lack of standing as if the question presented were whether a price fixing conspiracy could be challenged by an employee whose discharge was an incidental effect and not the object of that conspiracy. But the complaint alleged that Ostrofe was discharged and barred from further employment pursuant to a boycott agreement entered into as a part and in furtherance of the price-fixing conspiracy.

■ As the district court recognized, the boycott aimed at Ostrofe was a violation of the Sherman Act in itself, and Ostrofe had standing under Section 4 to seek damages for the injuries it allegedly caused him.[3] The court cited no authority for denying Ostrofe the right, in pursuing his remedy, to establish the context of the larger conspiracy of which the boycott was allegedly a part and from which it drew its

---

**2.** *See also Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 466 (9th Cir. 1964); *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 13–14 (1st Cir. 1979).

**3.** The district court erred in concluding the alleged "conspiracy was [not] directed . . . at plaintiff or other employees in any anti-competitive sense." The complaint alleged that the boycott element of the overall conspiracy was specifically directed at barring Ostrofe from employment. The purpose and necessary effect of the boycott was to eliminate competition in the marketing of Ostrofe's services in the industry. Thus, contrary to the district court's conclusion, the alleged conduct of defendant and its coconspirators "injured [plaintiff's] competitive position in the business in which he was engaged." *GAF v. Circle Floor Co.*, 463 F.2d 752, 758 (2d Cir. 1972). (Emphasis in original.) Group boycotts directed at a single trader or employee are illegal per se regardless of the overall effect on the economy. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13, 79 S.Ct. 705, 709–10, 3 L.Ed.2d 741 (1959).

purpose. Persons injured by an agreed-upon refusal to deal employed as a part of a conspiracy to restrain or monopolize trade and commerce have been permitted to challenge the conspiracy as a whole even though their injuries did not result from the restraint on competition that was the principle object of the conspiracy. *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Kiefer-Stewart Co. v. E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). *Solinger v. A. & M. Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978); *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332 (7th Cir. 1967); *Standard Oil Co. of Calif. v. Moore*, 251 F.2d 188 (9th Cir. 1957).[4] Evidence of the underlying conspiracy is clearly probative of the existence of a boycott employed in furtherance of the conspiracy.

In *Radovich* plaintiff alleged that pursuant to an agreement among the defendants he was boycotted and blacklisted because he played for a professional football league competitive with defendant's league. The boycott was alleged to have been part of a conspiracy to monopolize professional football in the United States in violation of Sections 1 and 2 of the Sherman Act. The player boycott was employed as a means of destroying the rival league. Plaintiff was allowed to challenge the conspiracy to monopolize of which the boycott was a part.

The present case is indistinguishable from *Radovich*.

## B. *Denial of Leave to Amend the Complaint*

It is a more difficult question whether Ostrofe also had standing to sue Crocker for damages under Section 4 on the theory of the case presented in Ostrofe's proposed amendment; that is, that Crocker unilaterally discharged Ostrofe as a means of effectuating the scheme to fix prices and allocate customers.

Parties injured by unilateral conduct in furtherance of an unlawful restraint of trade have been permitted to challenge the overall scheme.[5] But Crocker argues that it would extend liability too far to allow standing to sue for treble damages under Section 4 to persons injured only by a refusal to deal by a single conspirator in furtherance of a price-fixing conspiracy.

Section 4 limits standing in a private antitrust action for treble damages to a "person injured in his business or property by reason of anything forbidden in the antitrust laws." The courts have devised various "tests" for standing to sue designed to limit the expansive liability that might flow from a literal interpretation of the statute.[6] While not without utility, these "tests" have led to inconsistent, and unpredictable results.[7] Although sufficient to resolve clear

---

4. *See also Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299 (4th Cir. 1979); *Hoopes v. Union Oil Co.*, 374 F.2d 480, 485 (9th Cir. 1967); *Steiner v. Twentieth Century-Fox Film Corp.*, 232 F.2d 190, 193 (9th Cir. 1956); *United Copper Securities Co. v. Amalgamated Copper Co.*, 232 F. 574 (2d Cir. 1916).

5. Usually a unilateral refusal to deal has been involved. *See Engine Specialties, supra*, 605 F.2d 1; *Lee-Moore Oil Co., supra*, 599 F.2d at 1301–02. *See also Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Times-Picayune Publishing Co. v. U. S.*, 345 U.S. 594, 625–26, 73 S.Ct. 872, 889–90, 97 L.Ed. 1277 (1953). *See generally* 2 J. Von Kalinowski, *Antitrust Laws and Trade Regulation*, Ch. 6C, pp. 6C–1 through 6C–31 (1981).

In *Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073 (9th Cir. 1970) and *Hoopes, supra*, 374 F.2d 480, this court held plaintiffs injured by unilateral conduct in furtherance of

an unlawful restraint not amounting to a refusal to deal had standing to sue.

6. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891–92 n.14, 31 L.Ed.2d 184 (1972). *See e.g., Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir. 1973) (the "direct injury" test); *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 362 (9th Cir. 1955) (the "target area" test); *Mulvey, supra*, 433 F.2d at 1076 (the "reasonably forseeable" test); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1151 (6th Cir. 1975) (the "zone of interest" test); *Bravman v. Bassett Furn. Industries, Inc.*, 552 F.2d 90, 99–100 (3d Cir. 1977) (balance of factors test). *See also California State Council v. Associated General Contractors*, 648 F.2d 527, 537·38 & n.18 (9th Cir. 1980) (dictum approving zone of interests approach).

7. *See generally* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale

cases, less obvious cases require a balancing of competing policy interests, principally the interest in effective enforcement of the antitrust laws against the interest in avoiding vexatious litigation and excessive liability.[8]

On one hand, private treble damages actions under Section 4 constitutes a "bulwark of antitrust enforcement" by "insuring that the private action will be an ever-present threat to deter any one contemplating business behavior in violation of the antitrust laws." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968).[9] Thus Section 4 was "intended not merely to redress a personal injury, but to aid in achieving the broader purposes of the antitrust laws." Comment, "Standing to Sue for Treble Damages Under Section 4 of the Clayton Act," 64 Colum.L.Rev. 570, 571 (1964). The extent to which allowing a particular class of plaintiffs to bring suit for damages will further the enforcement purpose of Section 4 is an important factor in determining whether such plaintiffs should be allowed standing.

On the other hand, since the injurious consequences of antitrust violations may extend through large areas of the economy, the unfettered grant of standing might open the "floodgates of litigation" and "result in an over-kill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2nd Cir. 1971). The extent to which these and other considerations affect the practicality and fairness of suits for treble damages by a particular class of plaintiffs must be balanced against the importance such suits may have in the enforcement of the antitrust laws.

█ It is unnecessary, and would be contrary to the purposes of Section 4, to erect an arbitrary and absolute bar to treble damage suits for injuries that result from a conspirator's efforts to implement the anticompetitive aspects of the conspiracy. The interests counseling restriction of private treble damage actions may outweigh the interests of antitrust enforcement in some such cases. But the interests of antitrust

---

L.J. 809, 820 35 (1977); Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review*, 71 Colum.L.Rev. 1, 27 (1971).

*Compare*, for instance, *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971) *with Congress Building Corp. v. Loew's Inc.*, 246 F.2d 587 (7th Cir. 1957) and *Steiner, supra*, 232 F.2d 190; *compare Karseal, supra*, 221 F.2d at 364–65 *with Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 189 (2d Cir. 1970). *See In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122, 127 n.6 (9th Cir. 1973).

Contrary to the dissent's contention, the rationale of this circuit's line of precedent applying the "target area" test has not been clear and consistent. *See* Berger & Bernstein, *supra*, 86 Yale L.J. at 834 n.112. *Compare Mulvey, supra*, 433 F.2d at 1076 *with Contreras v. Grower Shipper Vegetable Association of Central California*, 484 F.2d 1346, 1347 (9th Cir. 1973). Some cases have embraced the notion of foreseeability, *see Twentieth Century-Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 220 (9th Cir. 1964), while others have seemingly ignored it. *See In re Multidistrict Vehicle Air Pollution*

*MDL No. 31, supra*, 481 F.2d at 129. Some have construed standing narrowly, *Conference of Studio Unions v. Loew's Inc.*, 193 F.2d 51 (9th Cir. 1951); others have broadly interpreted standing to encompass plaintiffs who were not engaged in the market which was the object of the unlawful activity. *See Hoopes, supra*, 374 F.2d at 485; *Steiner, supra*, 232 F.2d at 193; *Karseal, supra*, 221 F.2d at 364–65.

8. The Third Circuit has taken a similar approach, resolving standing by balancing various factors on a case by case basis. *See Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 581–87 (3d Cir. 1979); *Bravman, supra*, 552 F.2d at 99.

9. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965); *see generally* Pollock, *Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine*, 32 A.T. L.J. 5, 5 6 (1967); Berger, *supra*, 86 Yale L.J. at 809 n.1.

enforcement may predominate in others. This is such a case.

It might be argued that such a balancing of the policy considerations will encourage litigation, burden the courts, and produce essentially ad hoc results, and that a bright-line approach, though imperfect, is therefore preferable. As the brief analysis that follows reflects, however, the significant factors are relatively few, simple, and capable of producing predictable results.

Allowing persons who are discharged for refusing to participate in antitrust violations by their employers to commence treble damage actions will advance Section 4's purpose to further enforcement of the antitrust laws in a number of significant respects.

The agreement challenged by Ostrofe had as its purpose the fixing of prices and allocation of customers in a nationwide market. Such schemes are of grave concern to antitrust enforcement, yet they are invariably covert. Covert conspiracies in restraint of trade may go undetected by the intended victims.[10] Exposure of such schemes may depend upon encouraging disclosure by insiders. Allowing suits for treble damages by employees discharged by their employers for refusing to cooperate in the illegal scheme will encourage such disclosure. Absent such a remedy, persons in Ostrofe's position have little incentive to resist the unlawful scheme. If they take part they may be exposed to criminal liability, but detection is unlikely.[11] If they refuse to participate, however, discharge is virtually certain and, absent a remedy under Section 4, prospects for civil recovery are poor.[12]

No conspiracy to fix prices and allocate customers can be effective without the cooperation of responsible employees of each competitor. Discharge of those who refuse to participate is essential to success of the scheme. Affording discharged employees standing to sue for treble damages contributes to the enforcement of the antitrust laws by enhancing potential liability for a kind of conduct each business conspirator must engage in if it is to perform its role in the conspiracy.

Moreover, the grant of standing to such persons may prevent or mitigate injury to those who are the ultimate objects of the restraint. A timely suit by an employee discharged for resisting a price fixing

---

10. "[T]he detection rate of antitrust violations is much lower than that of other crimes because an antitrust violation 'is usually a concealed crime and there is rarely an identifiable victim who is aware of the violation.'" Berger, *supra*, 86 Yale L.J. at 847 n.172. (Citation omitted.)

11. *See* N. 10, *supra*.

12. The rights of private employees without contractual protection against arbitrary or retaliatory discharge are tenuous. *See e.g., Phillips v. Goodyear Tire & Rubber Co.,* 651 F.2d 1051, (5th Cir. 1981) (former employee alleging he was discharged in retaliation for giving truthful deposition testimony in antitrust litigation has no cause of action for wrongful discharge under state law.); *Martin v. Platt,* 386 N.E.2d 1026 (Ind.App.1979); *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174, 178 79 (Pa.Supreme Court 1974); *see generally* 53 Am.Jur.2d, Master & Servant § 43 (1970); Annot. 62 A.L.R.3d 271 (1975); Annot. 51 A.L. R.2d 742, 745 47 (1957). *Cf. Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981); *Harless v. First National Bank,* 246

S.E.2d 270 (W.Va.1978). *See generally* Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv.L.Rev. 1816, 1816–24 (1980).

The dissent argues Ostrofe has a wrongful discharge cause of action under California law. But the California doctrine is a minority rule. Effective enforcement of federal antitrust laws cannot be made to depend upon the availability of alternate remedies under varying local laws.

The dissent's contention that allowing antitrust standing to an employee discharged for refusal to participate in an antitrust violation preterits state employer-employee relations law "by heavy-handed interference from the federal courts" is specious. The overlap is minimal; our holding pertains only to employee terminations in furtherance of antitrust violations and not to the discharge of an employee for any other reason. As we demonstrate, *infra,* Ostrofe's termination lies within the core of Congressional concern underlying the antitrust laws.

scheme may prevent injury to the consumer or competitor who would otherwise have been its victims. Avoiding injury to the competitive structure itself is particularly important; once destroyed, competitive conditions may be difficult to restore. *See* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 847 (1977).

The harm to an employee discharged by his employer for refusing to participate in effectuating an antitrust conspiracy flows immediately, not remotely or indirectly, from the employer's violation of the Act; it is neither incidental to nor derivative from injuries done to others.[13] Thus, there is no more proximate victim who might be better qualified to bring suit for the damages sustained.[14]

These enforcement considerations offer strong support for allowing standing to persons discharged by their employer for refusing to participate in an antitrust violation.

On the other hand, allowing such persons to sue will have none of the negative consequences that might counsel denial of standing under Section 4.

Employees discharged by their employer for declining to take part in an antitrust violation are not so numerous that recognizing their claims would threaten a flood of litigation,[15] or impose a ruinous financial burden on the industry.[16] There is no danger of duplicative recovery. The damages done to such an employee are done to him alone; the damages he sustains are not passed on, nor possibly included in the losses of others.[17]

The complaint in this case alleges a deliberate and continuing understanding and course of conduct of a kind long and unequivocally condemned as per se illegal under the Sherman Act,[18] and treble damages would not constitute an unfair penalty inflicted unjustifiably upon an unwary defendant.[19]

Suits for damages by persons wrongfully discharged are common; courts are accustomed to assessing such damages; they are neither unduly speculative nor difficult to calculate, obviating another source of judicial concern.[20]

---

**13.** Cf. *California State Council, supra*, 648 F.2d at 538–39; *Martens v. Barrett*, 245 F.2d 844 (5th Cir. 1957). *Also compare Engine Specialties, supra*, 605 F.2d at 17–18.

The Ninth Circuit has denied standing to employees, *Solinger, supra*, 586 F.2d at 1311–1312, not because of a *per se* "no-employee-standing-rule" but because employee injuries were found to be only incidental to an antitrust violation. *See, e.g., Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1191–92 (9th Cir. 1980). The shortcomings of a standing rule based on categorization (i.e. by status as "employee," "distributor," "lessor" etc.) have been noted by Berger, *supra* at 830–32. The Fifth and Seventh Circuits have granted standing to employees able to show direct injury. *See, e.g., Dailey v. Quality School Plan, Inc.*, 380 F.2d 484 (5th Cir. 1967); *Nichols, supra*, 371 F.2d 332.

**14.** *See* Areeda, *supra*, § 334 at p. 168; *Lytle, supra*, 25 Amer.Univ.L.Rev. at 801; Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.Rev. 467, 500 (1980).

**15.** *See Hawaii v. Standard Oil, supra*, 405 U.S. at 261 62, 92 S.Ct. at 890–91; *Calderone Enterprises, supra*, 454 F.2d 1295.

**16.** *See Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975); *Harrison v. Paramount Pictures, Inc.*, 115 F.Supp. 312, 317 (E.D. Pa.1953), *aff'd*, 211 F.2d 405 (3d Cir. 1954).

**17.** *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir. 1910).

**18.** *U. S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940); *Timken Roller Bearing Co. v. U. S.*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *U. S. v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972).

**19.** *See* Lytle and Perdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation*, 25 Amer.Univ.L.Rev. 795, 798–800 (1976); P. Areeda & D. Turner, 2 *Antitrust Law* § 333, p. 162 (1978).

**20.** *See Calderone Enterprises, supra*, 454 F.2d at 1295; *see generally* Areeda, *supra*, § 333, p. 162, §§ 335a–335c, pp. 170–176, §§ 337d–337e, pp. 187–194. Where the underlying facts and magnitude of damages are reasonably clear, the danger of meritless vexatious litigation is minimal. *See* Sherman, *Antitrust Standing: From*

Treble damages would not be a windfall to persons discharged for refusing to take part in an anti-competitive scheme; their injury is directly and intimately related to the antitrust violation, and the remedial purpose for allowing the recovery of three times actual losses is satisfied.[21]

Since no limiting factor countervails the compelling reasons favoring standing, the balance of competing policy considerations strongly favors allowing employees who suffer loss inflicted in retaliation for opposition to anti-competitive schemes to maintain suit.

### C. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)

Particular mention should be made of the Supreme Court's decision in *Brunswick* in relation both to the motion to dismiss and the motion to amend.

In *Brunswick*, operators of bowling alleys brought suit for damages allegedly resulting from the acquisition by Brunswick Corporation of bowling centers that competed with plaintiffs. The acquisitions were claimed to violate Section 7 of the Clayton Act on the theory that "because of its size, [Brunswick] had the capacity to lessen competition in the markets it had entered by driving smaller competitors out of business." 429 U.S. at 481, 97 S.Ct. at 694. Plaintiffs claimed injury on the theory that if Brunswick had not acquired the local bowling centers then local competitors would have gone out of business and plaintiffs' profits would have increased. *Ibid.*

The Supreme Court held that Section 4 did not authorize suit for damages for such injury. The Court pointed out that plain-tiffs' injury had nothing to do with the potential anticompetitive effects that made the merger unlawful. Plaintiff's injury resulted from the preservation of competition rather than from the elimination of competition. To allow suit for such injury, the court said, "would make § 4 recovery entirely fortuitous, and would authorize damages for losses that are of no concern to the antitrust laws." 429 U.S. at 487, 97 S.Ct. at 697. The damages plaintiffs sought would "provide them with the profits they would have realized had competition been reduced.... It is inimical to the purpose of this law to award damages for the type of injury claimed here." 429 U.S. at 488, 97 S.Ct. at 697. The Court concluded:

> it is quite clear that if respondents were injured, it was not "by reason of anything forbidden in the antitrust laws": while respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur "by reason of" that which made the acquisitions unlawful.
>
> We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

429 U.S. at 488–89, 97 S.Ct. at 697–98. (Emphasis in original.)

Whether *Brunswick* applies to suits brought under Sections 1 and 2 of the Sherman Act is unclear;[22] so too is the distinction between the concepts of standing and antitrust injury.[23] In any event, the hold-

---

*Loeb to Malamud,* 51 N.Y.U.L.Rev. 374, 402–03 (1976).

**21.** *See Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.,* 429 U.S. 477, 486, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977).

**22.** *Compare Solinger, supra,* 586 F.2d at 1310; *Engine Specialties, supra,* 605 F.2d at 12–13; and *Lee-Moore Oil, supra,* 599 F.2d at 1302–03

*with Bosse v. Crowell Collier & MacMillan,* 565 F.2d 602, 606–07 (9th Cir. 1977).

**23.** *See John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 498–500 (9th Cir. 1977); *see also GAF, supra,* 463 F.2d 759. *Cf. Engine Specialties, supra,* 605 F.2d at 12 n.16. *See generally* Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L.Rev. 979, 994–

ing and rationale of *Brunswick* are entirely consistent with according standing to an employee discharged for interfering with the effectuation of an antitrust violation.

*Brunswick* could be read as limiting Section 4 to suits for damages caused by the anti-competitive effect of the particular antitrust violation. Similar language appears in lower court opinions.[24] So construed, *Brunswick* arguably would prevent suit by Ostrofe if his injury resulted only from unilateral conduct by Crocker in furtherance of the conspiracy rather than from the elimination of competition in the marketing of Ostrofe's services or in the marketing of labels. But such a construction of *Brunswick* would not be justified.

The language of *Brunswick* must be read in light of the problem to which it was directed. *Brunswick* dealt with a claim based upon injury from the effect of an alleged antitrust violation upon competi-tion. The Court was simply not concerned with a claim based upon injury stemming from conduct in furtherance of an antitrust violation.[25]

The central theme of *Brunswick* is that to be actionable under Section 4, plaintiff's injury should fall within the core of Congressional concern underlying the substantive provision of the antitrust laws allegedly violated.[26] In outlawing price fixing and customer allocation under the Sherman Act, Congress was concerned with competitive conditions in the product market; hence competitors and perhaps consumers injured by the elimination of competition between the conspiring business concerns have standing to sue.

But Congress was also concerned with the conduct of individuals acting on behalf of conspiring economic entities. Congress imposed criminal liability upon individuals who violate the Sherman Act even though they act in a representative capacity and in

997 (1977); Berger, *supra*, 86 Yale L.J. 835–40; 13 J. Von Kalinowski, *Antitrust Laws and Trade Regulation*, Ch. 101, pp. 101–3 (1980); Page, *supra*, 47 U.Chi.L.Rev. at 497–500.

24. *See, e.g., GAF Corporation v. Circle Floor Co., supra,* 463 F.2d at 758; *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31, supra,* 481 F.2d at 127, *Conference of Studio Unions, supra,* 193 F.2d at 54.

Even under this construction, *Brunswick* would not bar recovery of treble damages for injuries sustained by Ostrofe from the alleged boycott, since such injuries would result directly from the elimination of competition in the marketing of Ostrofe's services. *See* N.3, *supra*.

25. The same is true of *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31* and *Conference of Studio Unions.*

Notwithstanding the language in these opinions, this court has held plaintiffs injured by conduct in furtherance of an unlawful restraint and not by its ultimate effect may have standing to sue. *See Mulvey, supra,* 433 F.2d 1073; *Hoopes, supra,* 374 F.2d 480; *Steiner, supra,* 232 F.2d 190.

*GAF Corp. v. Circle Floor Co., supra,* 463 F.2d 752 relied upon by the district court does not compel a contrary result. Plaintiff GAF manufactured floortile. Defendant Circle Floor Co. installed floortile and was a customer of GAF. Circle Floor attempted to acquire working control of GAF to gain a competitive advan-tage over other manufacturers and contract installers. As a part of the attempt to take over, defendant reduced its purchases from GAF thereby depressing the market price of GAF's stock. The court denied GAF standing to sue Circle Floor Co. under Section 4. The court held that the takeover would not have resulted in anticompetitive harm to GAF. *Id.* at 759. GAF did not allege that its position in the market was or would be affected. Unlike the instant case and those cited *supra* at N.5, GAF was not driven out of business, terminated, or forced to comply at its own economic expense with the anticompetitive demands by the defendants.

With regard to the reduction of Circle Floor Co.'s purchases from GAF, the court held Circle Floor Co. had not alleged that the "refusal to deal" was either concerted or that it had diminished GAF's total sales or otherwise injured GAF. *Id.* at 759. The court did not suggest that an effective refusal to deal in furtherance of an anticompetitive goal would not have conferred standing had GAF in fact been injured thereby.

26. This court has similarly stated standing under Section 4 is available "to those individuals whose protection is the fundamental purpose of the antitrust laws." *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31, supra,* 481 F.2d at 122. *See California State Council, supra,* 648 F.2d at 538 n.18. *See also Mid-West Paper Products, supra,* 596 F.2d at 582–83.

discharge of the duties of the employment.[27] It cannot be said that Ostrofe's asserted loss was "of no concern to the antitrust laws." Ostrofe was injured because of his efforts to comply with the mandate of the Sherman Act; he suffered an "antitrust injury . . . of the type the antitrust laws were intended to prevent."

Moreover, the loss did not result from increased competition, as did the asserted loss in *Brunswick*, but from a conspirator's efforts to realize an anticompetitive purpose. As sales manager of one of the conspiring companies, Ostrofe's cooperation was necessary to effect the illegal restraint. Crocker demanded that Ostrofe engage in anticompetitive behavior, rig bids, sell at agreed-upon prices, and deal only with customers allocated to Crocker. When Ostrofe refused, his removal was essential to the success of the scheme. These facts disclose the "intimate relationship between circumstances which make the wrongdoer's conduct unlawful and the resulting harm which is the subject of the suit," required by *Brunswick*. Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L. Rev. 979, 990 (1977).[28]

### D. *Motion for Summary Judgment*

The court apparently treated the motion for summary judgment as if the question were whether, *excluding* evidence of an understanding among the manufacturers to fix prices and allocate customers and of the relationship between that understanding and Ostrofe's discharge, there remained sufficient evidence to raise a genuine issue of fact as to the existence of an agreement among the manufacturers to boycott Ostrofe.

The result of the district court's fragmentation of the scheme alleged in Ostrofe's complaint was to deny Ostrofe the benefit of evidence clearly probative of the existence of a boycott.

A conspiracy between business entities to adhere to agreed-upon prices and sales territories can only be effective if the sales personnel of the participating companies adhere to the prices and territories agreed upon in making sales on behalf of their employers. Therefore a trier of fact might reasonably infer from evidence of the existence of such a conspiracy that each of the participating companies had also impliedly agreed that it would secure the adherence of its sales personnel to the prices and territories agreed upon. It would also be reasonable to infer an understanding that any non-cooperating employee who jeopardized implementation of the conspiracy would be removed from his or her position and would not be rehired.

These inferences draw further support from the evidence that employees of Crocker's co-conspirators complained to Ostrofe about sales he made in violation of the conspiracy, that "highly placed" executives of the competing manufacturers complained to Crocker regarding Ostrofe's failure to adhere to the prices and territories agreed upon, and that Crocker then threatened to fire Ostrofe and bar him from future employment in the industry if he refused to cooperate.[29]

■ Considering the evidence offered in opposition to the motion for summary judgment and the inferences that might be

---

27. *U. S. v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

28. *See Engine Specialties, supra*, 605 F.2d at 13, 18; *Lee-Moore Oil, supra*, 599 F.2d at 1301, 1304.

29. Crocker argues that evidence of a demand for employment, admittedly lacking here, was required to make out a cause of action for concerted refusal to deal, citing *Cleary v. Na-*

*tional Distillers and Chemical Corp.*, 505 F.2d 695, 697 (9th Cir. 1974) and similar cases. Assuming this to be the law, summary judgment would still have been inappropriate. There was a disputed issue of fact as to whether a demand would have been futile. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 377 F.2d 776, 781 (3d Cir. 1967), *aff'd in part and rev'd in part*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

drawn from it in the light most favorable to Ostrofe,[30] we conclude that the evidence was sufficient to create a factual issue as to whether Ostrofe had been discharged pursuant to an implied understanding among conspiring label manufacturers. The motion for summary judgment should have been denied without weighing the evidence to the contrary.[31]

REVERSED.

KENNEDY, Circuit Judge, dissenting:

Where policy arguments are bounced about in the freewheeling manner of the majority opinion, it is a sign that either no precedent exists to guide us, or that existing precedent is being ignored. In this case, it is the latter, but in any event the rule announced here is a departure from sound antitrust principles. I state my respectful dissent.

An appropriate starting point for the case is the Supreme Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). I submit *Brunswick* stands for the proposition that antitrust laws are aimed at protecting competition, and that antitrust actions under section 4 of the Clayton Act are limited to persons injured as competitors in a defined market or in a discrete area of the economy. *Brunswick* does not mandate this construction in so many words, but it is the fair and logical interpretation of the case; and I had thought, at least until today, this interpretation of *Brunswick* was established doctrine in this circuit. *See Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1310, 1311 (citing *Brunswick* for propositions that "injury caused by the violation must be one the antitrust laws were designed to protect against"; and plaintiff must be within area of economy the antitrust laws were designed to protect); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498–500 (9th Cir. 1977) (discussing and applying *Brunswick* analysis).[1]

In *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), we emphatically re-embraced the target area theory for antitrust standing first set out in *Conference of Studio Unions v. Loew's Inc.*, 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), and we held that the plaintiff must allege injury

**30.** *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

**31.** *Scharf v. U. S. Attorney General*, 597 F.2d 1240, 1243 (9th Cir. 1979); *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210–11 (8th Cir. 1976).

**1.** Dictum in *California State Council of Carpenters v. Associated Gen. Contractors of Cal., Inc.*, 648 F.2d 527, 538 n.18 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982), referred approvingly to a "zone of interests" test adopted by the Sixth and Third Circuits. Even the Sixth Circuit, however, has modified its views expressed in *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975), which was cited in *California State Council of Carpenters*. In *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir. 1981), the court held that *Brunswick* "clearly establishes that a plaintiff must plead an injury of the type § 4 was intended to remedy before his case will be heard," *id.* at 1234, and the court imposed the requirement that a plaintiff plead antitrust injury in addition to its zone of interests standing standard, *id.* at 1234–35.

It should be noted that, as modified in light of *Brunswick*, the Sixth Circuit's zone of interests test differs from this circuit's target area test only in that the former "does not inject an element of proximate cause into the standing inquiry," but rather reserves the issue of "directness" as one to be resolved upon a factual showing. 643 F.2d at 1235–36. Under this new "zone of interests" test of the Sixth Circuit, the plaintiff here would not have standing, because he has not alleged "antitrust injury," but rather improper employee discharge, a tort or contract type of injury.

It should be noted also that the Third Circuit did not adopt a "zone of interests" test, but rather a test applying a number of factors, including direct injury and target area considerations, to each factual matrix. *Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d 501, 506 (3d Cir. 1973). That circuit also has included *Brunswick*'s antitrust injury requirement in the factors to be considered in determining standing. *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 582–83 (3d Cir. 1979).

"in the area of the economy in which the elimination of competition occurred." 481 F.2d at 128. We have continually reaffirmed the rule in this circuit. *See, e.g., Solinger v. A & M Records, Inc.,* 586 F.2d at 1310; *Bosse v. Crowell, Collier & MacMillan,* 565 F.2d 602, 606 (9th Cir. 1977); *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d at 499; *Blankenship v. Hearst Co.,* 519 F.2d 418, 425–26 (9th Cir. 1975). Although dicta in a footnote in our recent opinion in *California State Council of Carpenters v. Associated General Contractors of California, Inc.,* 648 F.2d 527 (9th Cir. 1980), *cert. granted,* —— U.S. ——, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982), indicated some discomfort with the doctrine, we again acknowledged that "[i]n this circuit, legal causation has traditionally been judged under the so-called 'target area' test."[2] *Id.* at 537.

The target area test is not restricted to resolving only clear cases, as the majority suggests, *supra,* at 1382–83, but rather was adopted carefully as a "logical and flexible tool" far superior to the crude direct injury test, which engaged in a "mere search for labels," and relied on "certain talismanic rubrics" to determine standing. *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d at 127–28. The target area test embodies this circuit's balancing of competing policy interests to determine whether a particular claimant falls within the class of persons intended to be protected by the antitrust laws. The test implicitly enforces *Brunswick's* requirement that a plaintiff must allege injury "that flows from that which makes defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. at 697.

This circuit's line of precedent is sound, yet the majority simply and erroneously ignores it. Here, the main conspiracy alleged as the premise of liability was not one to harm employees. It was one to fix prices and allocate customers in the nationwide market for paper labels. Appellant was not in the area of the economy endangered by the breakdown of competitive conditions; that is, he was not injured by the labels industry breakdown "the antitrust laws were intended to prevent," *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. It may be true, under appellant's theory, that in a strict causation sense the employee's termination resulted from the conspiracy, but collateral damages to persons outside the competitive area aggrandized by antitrust defendants are inconsistent with the orderly administration of the antitrust laws. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The congressional concern underlying the substantive provisions of the antitrust laws was competition, not employee coercion or discharge. Appellant's intimate relation with the scheme is not sufficient; he must be intimately related to its anticompetitive effect.

The majority opinion argues also that appellant should have been permitted to challenge and establish the context of the conspiracy as a whole in connection with an alleged boycott of his services and his employer's alleged unilateral refusal to deal with him in furtherance of the conspiracy. The cases cited for the proposition that persons have been permitted to challenge conspiracies as a whole even though their injuries resulted not from the principal ob-

---

2. In an explicit acknowledgment that precedent points to a conclusion contrary to its own, the majority writes: "*Brunswick* could be read as limiting section 4 to suits for damages caused by the anticompetitive effect of the particular antitrust violation. Similar language appears in lower court opinions.[24]" Majority opinion at 1387. Study of the footnote signal reveals a string citation of three cases in which the second and third cases listed are opinions of our own court, squarely contrary to the theory of the majority here. *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d

122 (9th Cir. 1973); *Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51 (9th Cir. 1951). At an earlier point, the majority writes that "[t]he courts have devised various 'tests' for standing to sue," majority opinion at 1382. Again, in a string cite in footnote 6, is a case setting forth this circuit's target area test. I doubt the concept of the law of the circuit properly could be treated in such cavalier fashion even by an advocate, and for a majority on a panel of this court to do so is cause for surprise and dismay.

ject of the conspiracy but from a subsidiary boycott are authorities such as *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), and *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Those cases are quite inappropriate here, for they involved boycotts that were the same type as, and a part of, the larger conspiracy. In *Radovich*, for example, the plaintiff challenged an alleged boycott of his services by the N.F.L. in connection with the boycott of the league to which he belonged in furtherance of a monopoly of professional football, all of which the antitrust laws were designed to prevent. Here, Ostrofe's discharge was a matter of employee coercion apart from the main price fixing scheme that the antitrust laws are designed to deter. *See Conference of Studio Unions v. Loew's*, 193 F.2d at 54. He cannot challenge the larger conspiracy in the guise of establishing the "context" for the alleged boycott against him.

Similarly, parties injured by unilateral conduct in furtherance of an unlawful restraint of trade have been permitted to challenge the overall scheme only when the unilateral conduct was part of, and created the same type of injury as, the main unlawful restraint conspiracy. *See, e.g., Albrecht v. Herald*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (plaintiff claimed his distributorship was cancelled by publisher because he refused to adhere to publisher's imposed maximum retail price); *Engine Specialties, Inc. v. Bombardier Limited*, 605 F.2d 1, 15 (1st Cir. 1979) (terminated plaintiff-distributor could challenge his manufacturer's agreement with another manufacturer to divide territorially market for minicycles because "ineluctable result" of allocation and division of markets was termination, so antitrust injury under *Brunswick* existed); *Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1301–02 (4th Cir. 1979) (jobber terminated by supplier alleged conspiracy among major oil producers to drive out such maverick jobbers and re-

strain competition); *Hoopes v. Union Oil Company of California*, 374 F.2d 480 (9th Cir. 1967) (plaintiff service station owner claimed supplier sought to restrain competition by restricting retail outlets, including plaintiff's, to sale of supplier's gas). The plaintiff in the instant case was not in the target area of either the price fixing conspiracy or a unilateral discharge in direct furtherance of the elimination of competition, and his motion to amend was properly denied.

Finally, as for the alleged subsidiary boycott aimed at appellant himself, although generally an employee can challenge an alleged boycott of his services in the employment market of an industry, he must put forward evidence to demonstrate the boycott apart from any other conspiracy. An unsupported inference of a boycott is not sufficient. Ostrofe's boycott claim was based solely upon alleged communications from his superiors to him, during his employment, that the company's competitors were complaining about Ostrofe's failure to cooperate. Appellant resigned voluntarily from the company despite their request for him to stay, and he did not attempt to obtain employment with any other industry employer. Appellant failed to offer any evidence whatsoever of ostracism or coercion alleged to have taken place since his resignation from the company. The district court properly granted summary judgment on the boycott claim for failure to come forward with evidence to support the charge. *See Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir. 1980); *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977).

The majority unsupportedly extends the reach of the antitrust laws beyond established precedent and beyond the intent of Congress. I should suppose that on nearly every occasion when a federal court announces an expansion of federal law to a new and previously unregulated area of conduct, it can invoke deterrence as the

rationale. The short answer to the argument here is that Congress did not design the antitrust laws to reach employee-employer relations as an enforcement mechanism. Congress has made participation in anticompetitive conduct a criminal offense, and this is a more direct and proper deterrent than to provide a treble damage windfall to discharged employees.

Even accepting for argument the theory that the necessity for deterrence is a ground for stretching antitrust actions beyond previously recognized boundaries, the deterrence argument is a weak one in this employee discharge case. The employee here already has considerable remedies and causes of action to deter conduct of the sort alleged in the complaint. Since *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), California has recognized the right of an at-will employee discharged for refusal to perform an unlawful act to sue for wrongful discharge on a breach of contract theory. Most recently, in a case involving facts strikingly similar to those presented here, the California Supreme Court held that the employee also has a cause of action based upon the tort of wrongful discharge, subjecting the employer to compensatory damages, damages for emotional distress, and punitive damages. In *Tameny v. Atlantic Richfield Company*, 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980), the California Supreme Court allowed a wrongful discharge tort action to be brought by an employee against his employer where the allegation was that, while a retail sales representative, the employee was discharged for refusing to participate in an illegal scheme to fix the retail gasoline prices of defendant's franchisees.

Ostrofe therefore has alleged facts that, if true, are the basis for a weighty cause of action against his employer on state law grounds for punitive and compensatory tort and contract damages. Such actions will provide the substantial deterrence sought to be achieved by the majority through the device of the antitrust laws. Although the California doctrine has been adopted only in some jurisdictions, the number is increasing, see *Phillips v. Goodyear Tire & Rubber Co.*, 651 F.2d 1051, 1055 (5th Cir. 1981); Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1822–24 (1980) (discussing "public policy" exception and its growth), and the substantive rights of recovery for such conduct rightfully should occur in the employee discharge context, rather than under the antitrust laws aimed at product competition. This sensitive development in the law of employer-employee relations should not be pretermitted by heavy-handed interference from the federal courts in the name of enforcing laws designed only for protecting the nation's competitive economic system.

I do not believe federalism is destined to fail, but neither is its continuance necessarily assured. If it does disappear, it will be primarily because those charged with enforcement of federal laws cannot resist the temptation to expand their jurisdiction to the outermost limits of abstract logic, even where history and common sense tell us the independent processes of our state systems are sufficiently vital to afford all the protection needed against certain evils. The decision of the court here illustrates that failing, and I dissent from the opinion and the judgment.