F. Joseph CALLAHAN

v.

SCOTT PAPER COMPANY.

Jeffrey W. BROWN

v.

SCOTT PAPER COMPANY.

Civ. A. Nos. 81–3786, 81–3788.

United States District Court,
E. D. Pennsylvania.

June 14, 1982.

William A. DeStefano, Oliver, DeStefano, Pentima & Partridge, Philadelphia, Pa., for plaintiffs Brown and Callahan.

Patrick W. Kittredge, Kittredge, Kaufman & Donley, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, Chief Judge.

In these two related civil actions, F. Joseph Callahan, plaintiff in C.A. 81–3786, and Jeffrey W. Brown, plaintiff in C.A. 81–3788, both former employees of the defendant, Scott Paper Company (Scott), allege *inter alia* that they were discharged from their employment with Scott because they exposed, objected to, and made efforts to eliminate unlawful price discounts and promotional allowances granted by Scott to certain "favored customers" in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13. Claiming that they have been injured in their business or property by reason of Scott's alleged antitrust violations, plaintiffs seek (1) treble damages under

section 4 of the Clayton Act, 15 U.S.C. § 15, and (2) to enjoin Scott from further violations of the antitrust laws, *see* 15 U.S.C. § 26. In addition, Brown and Callahan have asserted state-law claims, seeking damages and reinstatement on the theory of wrongful discharge. Jurisdiction over these latter claims exists by reason of diversity of citizenship. Presently before me are Scott's motions to dismiss the antitrust and wrongful discharge counts of plaintiffs' complaints on the ground that they do not state claims upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). For reasons discussed herein, I will grant Scott's motions.

### I. *The Antitrust Claims*

The factual allegations bearing on plaintiffs' antitrust claims, as set forth in their respective complaints, are substantially the same.[1] For purposes of these motions to dismiss, I accept the truth of those allegations.

Scott is a large corporation engaged in the manufacture of various paper products, including paper towels, toilet tissue, facial tissues, napkins and wax paper. Plaintiffs Brown and Callahan had been employed by Scott for 13 and 24 years, respectively, during which time they held various positions. At all times relevant to these lawsuits, however, they were employed in sales managerial capacities. In these positions, plaintiffs' compensation, bonuses, stock options, promotions and performance ratings were based in part on the sales and profits in their assigned territories, as well as on their ability to obtain new and retain old customers. Sometime between 1976 and 1980, Callahan became aware that Scott was offering unlawful price discounts and promotional allowances to some customers but not to others. Brown learned similar information in 1980 or 1981. Each objected to this unlawful activity and took steps to halt it. As a result, they came into conflict with their superiors. On February 19, 1981, Callahan was terminated without explanation. Approximately one month later, Brown was terminated, also without explanation.

---

1. Callahan and Brown are represented by the same counsel.

Brown, in Count I of his complaint, and Callahan, in Count II, allege that as a direct result of Scott's anticompetitive activity, they have suffered reduced compensation; lost the opportunity to increase their sales by adding new customers; witnessed a reduction in their potential for advancement; suffered a diminution of their professional reputation and integrity; and ultimately lost their jobs. They seek treble damages, and to enjoin Scott from engaging in further anticompetitive activity.

Scott contends that plaintiffs do not have standing to sue for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and therefore that plaintiffs' antitrust claims must be dismissed. More particularly, Scott argues that employees of the antitrust violator, as opposed to competitors or customers, do not have standing to sue their employer for violation of the antitrust laws. Plaintiffs maintain that the Court of Appeals for the Third Circuit has rejected the "competitors only" test and has opted instead for a standard which measures a particular plaintiff's standing based upon a "functional analysis of the factual matrix." Plaintiffs argue that under this latter approach they meet the standing requirement. Although I disagree somewhat with Scott's reasoning, I do agree that plaintiffs lack standing to sue for treble damages.

Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ." 15 U.S.C. § 15. Despite its broad language, however, the "courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891 n.14, 31 L.Ed.2d 184 (1972) (collecting cases). Thus, to restrict the availability of the relief provided by § 4 to those individuals whose protection is the fundamental purpose of the antitrust laws, "the courts have developed a standing doctrine 'peculiar to anti-

trust actions.'" *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 96 (3d Cir. 1977) (quoting *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1148 (6th Cir. 1975)), cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1978).

In *Cromar Co. v. Nuclear Materials & Equipment Co.*, 543 F.2d 501 (3d Cir. 1976), Judge Garth reviewed the history of the § 4 standing requirement in the Third Circuit. Without attempting to duplicate his scholarly efforts, it is nevertheless useful to reexamine the case law in this circuit to determine whether plaintiffs have standing to sue their former employer for damages for violating the antitrust laws. In two early *per curiam* opinions, *Melrose Realty Co. v. Loew's, Inc.*, 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), and *Harrison v. Paramount Pictures, Inc.*, 115 F.Supp. 312 (E.D. Pa.1953), aff'd, 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954), the court of appeals held that the lessor of a motion picture theater who was not engaged in the business of operating theaters, but whose rental income from the leased theater was based on a percentage of the lessee's receipts, did not have standing to sue the lessee or the motion picture distributors who had conspired to violate the antitrust laws by restricting the licensing of pictures at the theater. The decisions in *Melrose* and *Harrison* were based entirely on the district court opinion of Judge Kirkpatrick in *Harrison, supra.* Judge Kirkpatrick's analysis, however, was limited. Stating that it was impossible to define a general rule for gauging a plaintiff's § 4 standing, Judge Kirkpatrick found only that the lessor's injury—the diminution of rental income resulting from the alleged unlawful licensing restrictions—was too remote and clearly "beyond the limit of injuries cognizable under the antitrust laws." 115 F.Supp. at 317.

■ In a line of decisions subsequent to *Melrose* and *Harrison*, the court of appeals held that a shareholder of a corporation, whose only injury consisted of the diminu-

tion in value of his shares, did not have standing to maintain a § 4 suit for antitrust injury inflicted on the corporation. *E.g., Pitchford v. PEPI, Inc.,* 531 F.2d 92 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Ash v. International Business Machine Corp.,* 353 F.2d 491 (3d Cir. 1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966). The reason for denying the shareholder-plaintiff standing in each of these decisions was simple; "the language [in section 4 of the Clayton Act] does not include indirect harm that the individual may [have suffered] as a stockholder through injury inflicted upon the corporation." *Pitchford v. PEPI, Inc.,* 531 F.2d at 97. *Pitchford, Kauffman* and *Ash* are thus representative of the "direct injury" test of § 4 standing. The critical inquiry under direct injury analysis is whether there is some intermediate antitrust victim separating the plaintiff and the antitrust violator. If so, the plaintiff lacks standing. *See In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122, 127 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

In *International Ass'n of Heat and Frost Insulators & Asbestos Workers v. United Contractors Ass'n,* 483 F.2d 384 (3d Cir. 1973), *amended* 494 F.2d 1353 (3d Cir. 1974), the court of appeals tempered its restrictive approach to standing to sue under § 4 and permitted a group of unions to sue on behalf of their members even though the injury suffered by the union members was not the direct result of the defendants' anticompetitive conduct. Although the standing issue presented in *International Association* is dissimilar to that which confronts this court, the court of appeals' reasoning is instructive. Briefly summarizing the facts, 28 unions (Unions), on behalf of their members, sued the Associated Trades and Crafts Union (Trades and Crafts Union) and the United Contractors Association (Association), a trade association which, *inter alia,* acted as bargaining representative for the member contractors, for conspiring and

combining to restrain trade and eliminate competition in the construction industry in the Western District of Pennsylvania. To accomplish their scheme, the Association and the Trades and Crafts Union agreed that employees of members of the Association would be compelled to be members of the Trades and Crafts Union. In addition, the Association and the Trades and Crafts Union would enter into sham collective bargaining agreements, thereby enabling the employer members of the Association to gain a competitive advantage over the non-Association contractors who had *bona fide* collective bargaining agreements with the plaintiff Unions. Association members could then use their competitive advantage to effectively eliminate competition from the non-Association contractors. The Unions alleged that the defendants' scheme injured their members by denying them the right to work and earn wages on construction industry jobs which the Association members had obtained solely by reason of their unlawful competitive advantage.

Judge Forman, author of the opinion in *International Association,* conceded that the harm suffered by members of the Unions was indirect inasmuch as the defendants' unlawful scheme was directed at their employers, the non-Association contractors. Nevertheless, the court held that the Unions did have standing to sue on behalf of their members because the members were within the "target area" of the defendants' anticompetitive activity, *i.e.,* the area of the economy in which the elimination of competition occurred. The court's decision was based on the seemingly contradictory decision of the Court of Appeals for the Ninth Circuit in *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51 (9th Cir. 1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), which held that a union did not have § 4 standing to sue on behalf of its members, where the injury sustained by the members, the loss of their jobs, was the result of their employers' violation of the antitrust laws. Judge Forman, however, relied heavily on the following passage from *Conference*:

"The entire import of the alleged conspiracy, insofar as competitive conditions are concerned, is the attempt to destroy the [defendants' competitors]. Any restraint on commercial competition would occur in the production of motion pictures and we fail to see how the [plaintiffs] are in a position to complain about that situation. They are not in the business of producing motion pictures; they do not exhibit motion pictures; they neither compete with the [defendants] nor purchase from them. In fact, they *are not employees of the companies whom it is alleged the [defendants] intend to destroy.* The damage alleged to have been suffered by [plaintiffs] does not flow from any injury to the competitive situation of the motion picture industry, that is, their injury has not arisen from the acts allegedly perpetrated against the [defendants' competitors].

*International Association,* 483 F.2d at 397 (quoting *Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d at 54) (emphasis added by *International Association* court). Reasoning by negative implication, Judge Forman observed that, unlike the plaintiffs in *Conference,* the *International Association* plaintiffs were employees of the companies the defendants conspired to destroy. Thus, the injury to them, albeit indirect, could not be said to be incidental.

The next step in the development of the § 4 standing requirement came in *Pitchford v. PEPI, Inc.,* 531 F.2d 92 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976), where the officer of a corporation, who was also its primary shareholder, sought to recover damages for injuries stemming from unlawful restraints of trade imposed upon the corporation. Relying on its holdings in *Ash, supra,* and *Kauffman, supra,* the court held that the officer could not sue in his capacity as shareholder. In addition, the court held that any salary reduction suffered by him as a result of the injury to the corporation was not sufficient to give him standing to sue in his capacity as officer. In what appears to be a reaffirmation of the direct injury test, the court stated:

Moreover, salaries of corporate officers are not necessarily tied to corporate profits; other factors may weigh in the balance. To permit suits by officers for salaries lost in consequence of antitrust violations on the basis of facts such as were presented here would open the door to conjectural damage claims. Mere assertion of a relation between a corporation's losses and its officers' salaries without more does not provide the foundation necessary to establish standing to sue. If his salary as president is not simply the reverse side of his earnings as principal shareholder of the company, any reduction in his salary attributable to PEI's practices is too far removed along the causal chain to entitle Mr. Pitchford to standing.

531 F.2d at 97.

*Pitchford* created some consternation because after *International Association,* it had been thought that the court of appeals had adopted the more liberal target area approach to standing. The apparent inconsistency, however, was quickly resolved by Judge Garth in his opinion in *Cromar Co. v. Nuclear Materials & Equipment Corp.,* 543 F.2d 501 (1976). In *Cromar,* a manufacturer of parquet wood flooring sued for damages alleging that the defendant corporations had driven him out of business in their attempt to monopolize the production and sale of wood-plastic flooring. The defendants contended that the plaintiff lacked standing under either the direct injury or target area tests because plaintiff did not compete in the wood-plastic flooring industry. The court of appeals disagreed. Reviewing the precedents in this circuit, Judge Garth asserted that the court had never endorsed any particular test of § 4 standing. Rather, based upon his observations from the earlier cases, he concluded:

Each case, therefore, must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the

plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether this plaintiff is one "whose protection is the fundamental purpose of the antitrust laws." *In re Multidistrict Vehicle Air Pollution, supra* at 125.

543 F.2d at 506. Analyzing the factual allegations in plaintiff's complaint in terms of these relevant factors, the court concluded that the plaintiff did have standing because he was both a participant in the wood-plastic flooring industry and was directly affected by the defendants' unlawful acts.

The Court of Appeals for the Third Circuit has addressed the standing issue twice since *Cromar*, and on each occasion has applied a similar analysis. In the first such instance, *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3d Cir. 1977), cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1973), a furniture manufacturer's sales representative sought damages from two furniture manufacturers for allegedly conspiring to unreasonably restrain him from handling the lines of other furniture manufacturers, and for confining his sales of the defendants' lines to a specific sales territory. The effect and understanding of these restraints, plaintiff alleged, was to tend to create a monopoly in the sale of residential furniture. The defendants argued that since plaintiff did not compete with the defendants in the manufacture of furniture, and because he was in effect no more than an employee of defendants, he lacked standing to sue. On the basis of its decision in *Cromar*, the court summarily rejected defendants' characterization of plaintiff as simply an employee, stating that "§ 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems." 552 F.2d at 99. Then, analyzing the factual matrix, the court concluded that not only did the alleged anticompetitive acts affect plaintiff

directly, but also that plaintiff was a competitor within the target area of the defendants' conspiracy. Accordingly, the court concluded that plaintiff had standing to sue for damages.

The detailed factual analysis called for in *Cromar* and *Bravman* was similarly applied in the most recent decision in this circuit on § 4 standing, *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979). In *Mid-West Paper*, a number of manufacturers of consumer bags were sued by several plaintiffs for price-fixing. On the basis of the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the court dismissed the claims of many of the plaintiffs because they had not purchased bags directly from the defendants. One of the plaintiffs sought to recover damages for injury suffered by it as a direct purchaser of bags from *competitors* of the defendants, who allegedly were able to charge artificially high prices as a consequence of defendants' price-fixing. The court held that this plaintiff did not have standing because he was not in a direct or immediate relationship to the antitrust violators; his injury was highly conjectural; any attempt to prove a causal link between the defendants' acts and the plaintiff's injury would transform the trial into a complex economic proceeding; and to subject the defendants to potential liability where the causal link was so tenuous was not compatible with the purpose of Congress in enacting the treble damage remedy.

The foregoing brief survey of Third Circuit precedent on the § 4 standing requirement is valuable in analyzing the contentions of the parties. Scott argues that the case law essentially calls for a determination of whether plaintiffs are within the target area of Scott's alleged anticompetitive activity. Thus, Scott maintains that the proper approach is to identify the market protected by the substantive antitrust rule invoked by plaintiffs. According to Scott, the substantive antitrust rule invoked by Brown and Callahan, the Robinson-Patman Act, is designed to protect com-

petition between (1) Scott and its competitors (primary line competition) and (2) the customers of Scott (secondary line competition). As Scott notes in its memorandum of law in support of its motion, plaintiffs have alleged that Scott's price-discrimination practices have resulted in a lessening of competition at both the primary and the secondary lines. Scott concludes, however, that plaintiffs are not within the designated target area because they are neither its competitors nor its customers. Scott further contends that the court of appeals' decision in *Bravman* supports this analysis.

Plaintiffs vigorously dispute both the logic and the premise of Scott's argument. First, plaintiffs contend that Scott's argument reduces to the simply "competitors only" test for standing which was expressly rejected in *Cromar* and *Bravman*. Furthermore, plaintiffs contend that the standing issue cannot be resolved on the basis of a perfunctory "labels" analysis, but rather must be determined in accordance with the balancing approach announced in *Bravman*. Under the balancing test, plaintiffs argue that they do have the requisite standing because (1) their losses of compensation, bonuses, stock options, etc., resulted directly from the lessening of competition in the sales areas developed and serviced by them, and (2) they were in the target area since they had a "distinct commercial interest" in the area of the economy threatened by a breakdown of competitive conditions. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motions to Dismiss, Document 6, at 20).

Insofar as Scott contends that the target area test is the applicable standard in this circuit, I must reject its argument. However, while I agree with plaintiffs that the *Bravman* balancing test is the controlling criterion, I do not believe that application of the balancing test leads to a conclusion that plaintiffs have satisfied the § 4 standing requirement. In particular, except for their conclusory statement that they have a direct interest in the market where the non-favored customers operate, plaintiffs have not considered adequately the factors relied upon in *Cromar, Bravman* and *Mid-West Paper*. Simply stated, plaintiffs' memorandum of law contains only a superficial analysis of the factual matrix.

Examining the facts as alleged in plaintiffs' complaints, the following scenario is presented. Scott's discriminatory pricing practice resulted in a dual classification of its customers. Plaintiffs have denoted these classes as the "favored customers" and the "non-favored customers." The favored customers received the unlawful price discounts and promotional allowances; the non-favored customers did not. The plaintiffs, as regional sales managers, were assigned to territories servicing the accounts of the non-favored customers. Plaintiffs' compensation, performance ratings, bonuses, etc., were based in part upon the volume of sales to non-favored customers. With the lessening of competition among the customers of Scott attendant upon Scott's discriminatory practices, the volume of sales to the non-favored customers declined. This in turn had a negative effect on plaintiffs' compensation, promotional opportunities, etc. Ultimately, plaintiffs' employment with Scott was terminated. Plaintiffs suggest two rationales, operating either independently or in combination, for their discharge: They were discharged because of (1) the concomitant decline in sales to the non-favored customers, or (2) in retaliation for their efforts to stop Scott's continuing violation of the antitrust laws.

The injury suffered by plaintiffs as a result of the decline in sales to the non-favored customers is plainly derivative; it is a consequence of the secondary line injury caused by Scott's anticompetitive conduct. To understand the nature of plaintiffs' injury, therefore, the injury to competition between the favored and non-favored customers of Scott must be carefully examined. Put in terms of "antitrust injury", the injury which flows from that which makes the defendant's acts unlawful, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the injury to the unfavorably-treated customers of the price-discriminating seller has been aptly described by Professor Handler:

In a secondary-line price discrimination case, it is not the price differential itself which makes defendant's conduct unlawful ... rather, the illegality results (if at all) from the statute's proscribed "anticompetitive effects"—the likelihood that the alleged discrimination may substantially lessen competition. The crux of the illegality is the injury which stems from that likely lessening of competition—in other words, that the price discrimination may enable the favored purchaser to lower his resale price to the competitive disadvantage of the disfavored plaintiff.

*Brunswick* thus serves to reaffirm *Enterprise's* [*Industries, Inc. v. Texas Co.,* 240 F.2d 457 (2d Cir.), *cert. denied,* 353 U.S. 965 [77 S.Ct. 1049, 1 L.Ed.2d 914] (1975)] basic teaching: that cognizable injury in a section 2(a) case is to be traced *not* to the higher price paid by the plaintiff (the overcharge)—since the infraction is a price *difference* and all the law requires of the seller is a parity in pricing—but rather to the *undercharge* to plaintiff's competitor. Justice Cardozo, with characteristic felicity, put it this way in a different, but related, context: "The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." Put in *Brunswick*'s terms, the fact that the disfavored purchaser pays more for the same product than the favored purchaser, while constituting a form of economic injury or harm to plaintiff's pocketbook, does not amount to "antitrust injury" or provide a proper measure of antitrust damages. On the other hand, "antitrust injury" is sustained where it can be shown that the favored competitor, by virtue of his lower cost, lowered his resale price so that the plaintiff either lost sales volume (if he did not meet this competition) or lost profits (if he did match the lower resale price). It is the harm from the discrimination, that is, the undercharge and not from the overcharge which constitutes antitrust injury in the *Brunswick* sense.

Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L.Rev. 977, 992–93 (1977) (footnotes omitted) (emphasis in original). *Accord J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

From Professor Handler's analysis, it is not difficult to visualize the lengthy causal chain between Scott's antitrust violations and the injury to plaintiffs resulting from the decline in sales to the non-favoreds. To establish their injury, plaintiffs would first have to show how the favored customers were able to translate the illegal undercharges and promotional allowances into a lower resale price than that charged by the non-favoreds. Second, plaintiffs would have to establish the extent to which the favoreds were able to utilize this price advantage to siphon away the resale customer demand previously satisfied by the non-favoreds. Third, they would have to show how the sales lost by the non-favoreds affected the non-favoreds' demand for paper products from Scott. Finally, plaintiffs must show how the decline in sales to the non-favoreds affected their compensation, bonuses, stock options, etc.

Based upon the chain of economic causation necessary to establish that portion of plaintiffs' injury consequent upon the lessening of competition among the customers of Scott, a few generalizations are possible. First, considering "plaintiffs' relationship to the alleged violator of the antitrust laws—the directness or indirectness of the injury," *Cromar Co. v. Nuclear Materials & Equipment Corp., supra,* 543 F.2d at 508, it is patent that there are several intermediaries separating Scott and the injury to plaintiffs. Thus, plaintiffs' situation is very much unlike that of the plaintiff in *Bravman* who was directly affected by the unlawful restrictive agreements imposed upon him by the defendants in that case. Rather, plaintiffs' position *vis-a-vis* Scott more closely approximates that of the corporate officer in *Pitchford* who was denied standing to sue for compensation lost as a result of antitrust injury inflicted upon his employer. Indeed, if anything, the injury of

plaintiffs here is considerably more attenuated from the antitrust violation than was the officer's injury in *Pitchford.*

Second, considering plaintiffs' position in the area of the economy threatened by Scott's discriminatory practices, plaintiff can make no convincing argument that they were within the target area. Unlike in *Cromar* and *Bravman,* the illegal acts alleged here were not aimed at plaintiffs. Plaintiffs do not claim to be participants in the segment of the economy engaged in the resale of Scott paper products. Plaintiffs are not competitors of the favored customers, nor are they employees of the injured non-favoreds. Plaintiffs argue, however, that they have a distinct commercial interest in maintaining competitive conditions at the secondary line. This may be so, but it is hardly sufficient to give them standing. Plaintiffs in *Melrose* and *Mid-West Paper* had similar commercial interests in preserving competition, but this alone did not give them standing to seek treble damages.

Finally, the damages suffered by plaintiffs are no less conjectural than those suffered by the *Mid-West Paper* plaintiff who, because of defendants' price-fixing scheme, was forced to pay higher prices for the product of defendants' competitors. To recover in these lawsuits, plaintiffs would have to show more than Scott's price discrimination; they would be required to establish actual injury resulting therefrom. *J. Truett Payne Co. v. Chrysler Motors Corp., supra.* Qualitative economic analysis does support the inference that secondary line injury would adversely affect plaintiffs' compensation and fringe benefits. But plaintiffs must show more than a theoretical negative effect; they must in addition establish with reasonable certainty the quantitative impact of Scott's antitrust violations upon them. Any attempt to do so, however, "would transform this antitrust litigation into the sort of complex economic proceeding that the *Illinois Brick* [*Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)*] Court was desirous of avoiding if at all possible." *Mid-West Paper Products Co. v. Continental Group, Inc.,*

*supra,* 596 F.2d at 585. The chain of economic causation linking Scott's unlawful acts and plaintiffs' injury is a great deal more complex than outlined earlier. At each and every link of the chain, several independent factors are operating, many of which presumably would act to mitigate the ultimate effect on plaintiffs of the initial discriminatory undercharges and promotional allowances. In sum, to paraphrase Judge Adams' opinion in *Mid-West Paper,* it cannot readily be said with any degree of economic certitude to what extent, if at all, plaintiffs have been injured by Scott's violations of the antitrust laws.

To be sure, there are countervailing considerations which weigh in favor of recognizing the standing of plaintiffs Brown and Callahan. It does appear that their injuries will go uncompensated if standing is denied. In addition, the deterrent objective of the treble damage remedy is not advanced by denying plaintiffs the opportunity to present their claims. The compensatory and deterrent purpose of the antitrust laws are undoubtedly important concerns. They are not, however, the only concerns. As Judge Adams recently observed in *Mid-West Paper, supra,* the primary goal of the antitrust laws is to preserve competition. The remedial objectives of the antitrust laws, namely, compensation of victims and deterrence of violators, are not ends in themselves. Indeed, if the deterrent purpose of the treble damage remedy were pressed to its extreme, there would not be a § 4 standing doctrine. If such were the case, any person who could show injury in fact traceable to a violation of the antitrust laws would have standing to sue regardless of how remote his injury. Surely this could not have been the intent of Congress in enacting § 4. Hence the remedial purposes served by § 4 must not be considered in the abstract, but rather in relation to all the factors which courts traditionally have relied upon in evaluating a particular plaintiff's standing to sue under § 4. In addition, because the overriding goal of the antitrust laws is the preservation of competition, consideration must be

given to "whether a duplicative or ruinous recovery will result and whether resolution of the claim will unduly complicate the trial by necessitating the pursuing of complex and conjectural economic lines of causation and effect." *Id.* at 583 (footnotes omitted).

■ Having given attention to all of the relevant concerns, I hold that the damages suffered by plaintiffs as a result of the injury inflicted by Scott upon the non-favored customers are not sufficiently connected to Scott's alleged violations to give plaintiffs standing. As demonstrated earlier, plaintiffs' injury did not result directly from Scott's violation of the antitrust laws; plaintiffs were not participants in the area of the economy threatened by Scott's discriminatory practices; and the goal of the antitrust laws to preserve competition would not be served by subjecting Scott to liability where the fact of plaintiffs' injury is so conjectural. In my view, all of these factors override the compensatory and deterrent objectives of the treble damage remedy. If, in fact, Scott violated the antitrust laws with the requisite state of mind, it is subject to harsh criminal penalties. In addition, to the extent that plaintiffs' injuries may go uncompensated, I simply note that the antitrust laws were never intended to be a panacea. The court of appeals has denied standing in the past where the victim has been left remediless. *E.g., Mid-West Paper Products Co. v. Continental Group, Inc., supra; Pitchford v. PEPI, Inc., supra.* But, once again, to quote the court in *Mid-West Paper*:

> [T]he § 4 standing doctrine "acknowledges that while many remotely situated persons may suffer damage in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of [someone] who is an immediate victim of the violation," and that "if the flood-gates were opened to permit treble damage suits ..., the lure of a treble recovery ... would result in an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress."

596 F.2d at 587 (quoting *Calderone Enterprises, Inc. v. United Artist Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972)).

■ I also reject plaintiffs' contention that they have § 4 standing to sue for the damages sustained by them when they were fired in retaliation for their objection to Scott's violation of the antitrust laws. Admittedly, with respect to the retaliatory discharge aspects of plaintiffs' antitrust claims, there are no major impediments to proving the fact of their injury. In addition, strong public policy arguments can be made in support of plaintiffs' standing. Nevertheless, it would serve no purpose to engage in a public policy debate where it is manifest that the antitrust laws were not designed to protect plaintiffs from the type of injury for which compensation is sought here. Scott did not direct its discriminatory practices at plaintiffs, and plaintiffs cannot rightfully contend that their injury was a consequence of a breakdown in competitive conditions. Rather, plaintiffs were discharged in an alleged attempt by Scott to cover-up its wrongdoing. Without condoning Scott's actions, I do not believe that the treble damage action was intended by Congress as a remedy to an employee discharged for objecting to his employer's violation of the antitrust laws. In this latter respect, I agree with Judge Fullam who, in a similar case rejected the argument which plaintiffs now have advanced:

> The legal injury allegedly sustained by plaintiff was discharge from employment, not an injury "in his business or property by reason of anything forbidden in the antitrust laws ...." 15 U.S.C. § 15. It was not the discriminatory pricing which caused his discharge, but the fact that he complained about it.

*Booth v. Radio Shack Division,* C.A. No. 81–3670, slip op. at 2 (E.D.Pa., Jan. 27, 1982).

I am not convinced by plaintiffs' argument that *Ostrofe v. H. S. Crocker Co.,* 670 F.2d 1378 (9th Cir. 1982), supports the position that an employee who is fired for

threatening to expose his employer's violation of the antitrust laws has standing to sue for treble damages under § 4. In *Ostrofe*, the plaintiff alleged that his employer and other unnamed manufacturers of lithograph labels conspired to fix prices in the industry and to "boycott those persons, including plaintiff, who ... interfered or threatened to interfere with their illegal plan." *Ostrofe v. H. S. Crocker Co.*, 670 F.2d at 1380. *Ostrofe* further alleged that when he refused to participate in the scheme, "Crocker's co-conspirators complained to Crocker's executive officers who warned Ostrofe that if he did not participate in the illegal scheme he would be discharged and prevented from participating in the label industry in the future." *Id.* Ultimately Ostrofe was forced to resign and was boycotted from further employment in the industry. Based primarily on policy grounds, the Court of Appeals for the Ninth Circuit concluded that Ostrofe's factual allegations were sufficient to give him § 4 standing.

Plaintiffs' reliance on *Ostrofe* is misplaced. Unlike in *Ostrofe*, Scott's anticompetitive conduct was not directed against plaintiffs. Scott did not participate in any unlawful group boycott to prevent plaintiffs from being employed in the paper products industry. More importantly, I do not believe that *Ostrofe* was correctly decided. In particular, like Judge Kennedy who dissented in *Ostrofe*, I disagree with the *Ostrofe* majority's assertion that "[t]he central theme of *Brunswick* [*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)] is that to be actionable under Section 4, plaintiff's injury should fall within the core of Congressional concern underlying the substantive provision of the antitrust laws allegedly violated." 670 F.2d at 1387 (footnote omitted). Rather, as I read *Brunswick*, a person suing

for damages under § 4 must show that his damages were caused by the anticompetitive effect of the particular antitrust violation. As stated earlier, plaintiffs were discharged for objecting to Scott's price discrimination, not because of any lessening of competition. Thus, whether phrased in terms of antitrust injury or § 4 standing, the injury suffered by plaintiffs as a result of the retaliatory discharges does not give rise to a suit for treble damages under § 4.

Having determined that plaintiffs lack standing to sue for damages under § 4 of the Clayton Act, I will grant Scott's motions to dismiss Count I of the Brown complaint and Count II of the Callahan complaint.[2]

## II. *Wrongful Discharge Claims*

Callahan, in Count III of his complaint in C.A. 81–3786, and Brown, in Count II of his complaint in C.A. 81–3788, allege that they were discharged by Scott in retaliation for their objection to, exposure of, and efforts to eliminate the illegal price discounts and promotional allowances which Scott extended to certain favored customers. Scott contends that such conduct is not actionable under Pennsylvania law because, as it interprets the reported decisions, the cause of action for wrongful discharge has been recognized only where the discharge was motivated by the employer's attempt to interfere with a right conferred or obligation imposed on the employee by the state legislature. Since plaintiff had no statutory right or obligation to object to Scott's alleged violations of the antitrust laws, Scott argues that the wrongful discharge claims must be dismissed. Alternatively, Scott argues that should the court reject its interpretation of Pennsylvania law, plaintiffs' wrongful discharge claims must nevertheless be dismissed because plaintiffs' allegations, in material respect, are indistinguish-

2. Although plaintiffs also pray for injunctive relief—as to which a somewhat different standard for standing may be applicable, *see Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205 (3d Cir. 1980), it is quite apparent from plaintiffs' failure to raise this distinction, both in their legal memoranda and at oral argument, that plaintiffs' real concern is damages. Accordingly, I see no reason to discuss at length the legal arguments which may support their claim for injunctive relief. Since I believe plaintiffs' claims are beyond the scope of the antitrust laws, I will grant Scott's motions to dismiss the antitrust claims in their entirety.

able from those which the Pennsylvania Supreme Court in *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), held insufficient to state a cause of action. Since I agree that under *Geary* plaintiffs have not stated a claim upon which relief can be granted, I leave for the Pennsylvania courts to determine the merit of defendant's argument that Pennsylvania's recognition of a cause of action for wrongful discharge is confined to that class of employees who have been discharged in retaliation against their exercise or performance of a statutory right or obligation.

In *Geary v. United States Steel Corp.*, the plaintiff alleged that the defendant company had wrongfully and maliciously discharged him because he had complained to high company officials that the company's product was unsafe and constituted a serious danger to potential users. The trial court dismissed plaintiff's complaint and the Pennsylvania Superior Court affirmed, presumably applying the rule of law long adhered to in Pennsylvania and in the vast majority of other jurisdictions that, absent a contractual or statutory provision to the contrary, the employment relationship may be terminated by either party at any time for any or no reason. *See Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1981). *See generally* Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816 (1980). Although the Pennsylvania Supreme Court affirmed the dismissal of plaintiff's complaint, in dicta the court stated that the time had come to impose judicial restrictions on the employer's absolute right to discharge an at-will employee at its pleasure.

Unfortunately, the restrictions which the court had in mind were not defined precisely. The court suggested that it might recognize a cause of action for wrongful discharge where the employee was terminated in violation of a "clear mandate of public policy." 456 Pa. at 185, 319 A.2d at 180. Applying that standard to the facts of the case before it, the court concluded that the public policy considerations raised by plaintiff's complaint did not override the employer's legitimate interest in maintaining the normal operation of its business.

The Pennsylvania Supreme Court has never elaborated on its decision in *Geary*, but the dicta suggesting an exception to the employment at-will doctrine where the discharge violated a clear mandate of public policy was taken up shortly thereafter by several courts as embodying the law of Pennsylvania. *See, e.g., Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir. 1979) (employee fired for refusing to submit to polygraph examination had cause of action for wrongful discharge where Pennsylvania statute made it a misdemeanor for employer to require such exam as a condition of continued employment); *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (applicant for public employment who was scheduled to begin job-training yet denied position because he failed to disclose 13-year old misdemeanor conviction had cause of action for wrongful refusal to hire where he had received unconditional pardon for the offense) (alternative holding); *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (employee's cause of action sustained where he had been discharged for performing his obligation of jury service). Notwithstanding the recognition that a cause of action exists where the discharge of an at-will employee threatens public policy, several courts have emphasized that the public policy exception is extremely narrow. *See Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 195 (3d Cir. 1977); *Boresen v. Rohm & Haas, Inc.*, 526 F.Supp. 1230, 1236 (E.D.Pa.1980); *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 571, 422 A.2d 611, 616 (1980). Indeed, in a number of cases the alleged public policy violation resulting from the plaintiff-employee's discharge has been found to be insufficient as a matter of law to withstand the defendant's motion for dismissal or

summary judgment.[3] Although each case must be decided on its own facts, these cases are nonetheless revealing in that they evidence the great reluctance of the courts to recognize a right of action in an employee who alleged that he was terminated in contravention of public policy.

Recently, in *Yaindl v. Ingersoll-Rand Co., supra,* the Pennsylvania Superior Court attempted to provide an analytical framework for determining whether the factual allegations in an employee's complaint are sufficient to state a cause of action:

> [W]e must weigh several factors, balancing against [the employee's] interest in making a living, his employer's interest in running its business, its motives in discharging appellant and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge.

281 Pa.Super. at 577, 422 A.2d at 620. As a practical matter, however, *Yaindl*'s balancing test is essentially no different than that utilized in *Geary* to uphold the dismissal of the plaintiff's complaint:

> The praiseworthiness of Geary's motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption. In sum, while we agree that employees should be encouraged to express their educated views on the quality of their employer's products, we are not persuaded that creating a new non-statutory cause of action of the sort proposed by appellant is the best way to achieve this result. On balance, whatever public policy imperatives can be discerned here seem to militate against such a course.

*Geary v. United States Steel Corp., supra,* 456 Pa. at 183, 319 A.2d at 180.

■ Frankly, I see no meaningful qualitative distinction between the public policy concerns implicated in *Geary* and those resulting from the discharge of either Callahan or Brown. Accordingly, if the balance in *Geary* tipped in favor of the employer, I see no reason why the result should be otherwise here. Without minimizing the praiseworthy efforts of plaintiffs Callahan and Brown to redirect what they viewed as unlawful activity by Scott, the question of concern on this motion is not whether plaintiffs were correct in their assessment that Scott was violating the antitrust laws, but whether an employer may rightfully fire an employee who objects to company policy and thereby asserts that his business judgment is superior to that of the company officials who are hired and compensated handsomely for the exercise of their entrepreneurial skill and ability. In *Geary* the Pennsylvania Supreme Court held that employee complaints on matters generally entrusted to management, even where motivated by a sincere concern for human safety, do not outweigh the employer's interest in preventing disruptions to its operations. Surely if that is so, the employer's interest must also be paramount where the employee objects to pricing decisions of his employer on the ground that they cause harm to competition. *See Broyer v. B. F. Goodrich Co.,* C.A. No. 75–2288 (E.D.Pa., Jan. 11, 1978) (bench opinion).

Accordingly, I will grant Scott's motion to dismiss plaintiffs' wrongful discharge claims.

**3.** *E.g., Boresen v. Rohm & Haas,* 526 F.Supp. 1230 (E.D.Pa.1980); *Rogers v. IBM,* 500 F.Supp. 867 (W.D.Pa.1980); *Lekich v. IBM,* 469 F.Supp. 485 (E.D.Pa.1979); *O'Neill v. A.R.A. Services, Inc.,* 457 F.Supp. 182 (E.D.Pa.1978); *Broyer v. B. F. Goodrich Co.,* No. 75–2288 (E.D. Pa., Jan. 11, 1978) (bench memorandum); *Yaindl v. Ingersoll-Rand Co.,* 281 Pa.Super. 560, 422 A.2d 611 (1980).