**GREGORY MARKETING CORPORA-TION and Daniel Scher, Appellants,**

v.

**WAKEFERN FOOD CORPORATION and Red Cheek, Inc., Appellees.**

No. 85–5206.

United States Court of Appeals, Third Circuit.

Argued Dec. 5, 1985.

Decided March 26, 1986.

Bruce H. Nagel (argued), Robert E. Bennett, Meth, Nagel, Rice, Woehling & Bausch, West Orange, N.J., for appellants.

Dennis J. Block, Jay N. Fastow (argued), Sanford F. Remz, Robert A. Machson, Weil, Gotshal & Manges, New York City, and Frederick K. Becker, Roger B. Kaplan, Wilentz, Goldman .& Spitzer, Woodbridge, N.J., for appellee Wakefern Food Corp.

Daniel K. Van Doren (argued), Louis Ruprecht, McDermott, McGee & Ruprecht, Millburn, N.J., for appellee Red Cheek, Inc.

Before ADAMS, Acting Chief Judge, GIBBONS and STAPLETON, Circuit Judges.

**OPINION OF THE COURT**

ADAMS, Acting Chief Judge.

Under the Robinson-Patman Act, a seller ordinarily may not charge different buyers unequal prices for the same product. The issue in this appeal is whether a law suit challenging alleged price discrimination may be maintained under § 4 of the Clayton Act by a broker whose services were terminated for refusing to carry out a manufacturer's allegedly unlawful discount for a preferred buyer. The district court dismissed the claim, ruling that the broker was not a proper party to bring suit under the antitrust laws. We agree, and therefore will affirm.

I.

Since 1954, appellant Gregory Marketing Corporation (Gregory) has served as a broker in New Jersey for Red Cheek, Inc. (Red Cheek), a manufacturer of apple juice. As broker, Gregory sold Red Cheek's products to commercial distributors and retailers, including Wakefern Food Corporation (Wakefern), a large buying cooperative engaged in bulk purchasing and redistribution on behalf of numerous supermarket chains. Under an agreement with the manufacturer, Gregory was compensated by receiving a percentage of its gross sales of Red Cheek products.

In 1984, Red Cheek began providing Wakefern with special price discounts not available to other purchasers. For example, according to Gregory's complaint,

which is assumed to be true for purposes of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), while all other customers paid $11.85 for each case of 40-ounce containers of apple juice, Wakefern began receiving one case free for each case purchased.

When he learned of these practices in February 1984, Daniel Scher, Gregory's majority shareholder and a corporate officer, objected, and informed Red Cheek that the discounts to Wakefern were unlawful.[1] Red Cheek, however, declined to stop the discounts. Instead, according to the complaint, it directed Gregory to fabricate explanations justifying the discounts for any of Wakefern's competitors who inquired. When Gregory refused to comply, Red Cheek terminated its brokerage agreement.

On October 31, 1984, Gregory filed suit against Red Cheek and Wakefern, alleging that they violated the Robinson-Patman Act, 15 U.S.C. § 13(a) (1982).[2] The Act prohibits sellers from discriminating in price between different purchasers of a product in order to give one a competitive advantage. The complaint was brought under Section 4 of the Clayton Act, which affords treble damages to plaintiffs injured by "anything forbidden in the antitrust laws."[3] 15 U.S.C. § 15(a) (West Supp. 1985). Gregory alleged that it had suffered two distinct injuries as a consequence of the defendants' pricing practices: Red Cheek's retaliatory termination of the brokerage agreement resulted in the loss of future brokerage commissions plaintiff otherwise would have received, and the discounted prices on sales to Wakefern reduced the broker's commission on the gross sales it actually made to the buying cooper-

ative before being terminated. In addition to the federal claim, Gregory also asserted pendent state claims, including breach of a brokerage agreement, violation of state antitrust statutes, and tortious interference with plaintiff's contract rights and prospective business advantage.

The district court granted the defendant's motion to dismiss on February 25, 1985. Drawing on a series of Supreme Court cases designed to limit the broad scope of the Clayton Act's treble damage provision, the court ruled that Gregory could not maintain a complaint challenging the anticompetitive Red Cheek-Wakefern pricing scheme because the broker's injury did not result from the anticompetitive nature of the arrangements. Gregory's injury did not flow "from that which makes defendants' acts unlawful," *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982), *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and thus it "is not the type of injury that the antitrust laws were written to guard against," the district court declared. As further grounds for ruling that Gregory could not maintain the suit, the court noted that Wakefern's competitors, who were directly injured by the pricing scheme, could still sue for treble damages. Allowing the broker to sue, therefore, would subject the defendants to "overkill" by exposing them to the risk of multiple treble damage liability.

In dismissing Gregory's claim, the court specifically declined to apply the rule of

1. Scher was also a plaintiff in the lawsuit, and joined Gregory in filing this appeal. However, it was conceded below that Scher lacked standing as an individual to bring suit, and that his claim was entirely derivative of Gregory's.

2. The Act states, in pertinent part, that:
   [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of

commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...." 15 U.S.C. § 13(a).

3. Section 1 of the Clayton Act defines "antitrust laws" as the Sherman Act, the Wilson Tariff Act, and the Clayton Act. This includes the first section of the Robinson-Patman Act, which is an amendment to the Clayton Act. *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 376–379, 78 S.Ct. 352, 355–356, 2 L.Ed.2d 340 (1959).

*Ostrofe v. H.S. Crocker Co., Inc.,* 670 F.2d 1378 (9th Cir.1982), *vacated and remanded,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand,* 740 F.2d 739 (9th Cir.1984), *cert. dismissed,* — U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), which allowed an antitrust suit by an employee forced to resign from his job for declining to carry out a price fixing arrangement. The district court suggested that an employee's injury is more closely linked to the antitrust violation than a broker's would be, and further stated that neither the Supreme Court nor the Third Circuit has yet extended standing under the antitrust laws as far as the *Ostrofe* court. *See McNulty v. Borden, Inc.,* 542 F.Supp. 655 (E.D.Pa.1982). Gregory filed a timely appeal.

## II.

On its face, Section 4 of the Clayton Act defines an extremely broad class of persons who may bring a private action for treble damages under the antitrust laws. The language allows a suit by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Thus, "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). While acknowledging that the lack of restrictive terms in this provision "reflects Congress's 'expansive remedial purpose,'" *Blue Shield of Virginia, Inc. v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2544, 73 L.Ed.2d 149 (1982) (quoting *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 314, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978)), the Supreme Court has declined to read the statute as broadly as its language would allow. Instead, it has imposed limitations consistent with the statutory policies behind the awarding of treble damages: deterring antitrust violators and depriving them of the fruits of their illegal actions, and providing ample compensation to the victims. *Pfizer,* 434 U.S. at 314, 98 S.Ct. at 588; *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 963 (3d Cir. 1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984).

The restrictions fall into two categories. First, the Supreme Court has refused to permit antitrust actions that raise the risk of multiple treble damage recoveries or complex damage theories that would make antitrust suits unduly difficult to try. Thus, in *Hawaii v. Standard Oil,* 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972), it held that § 4 did not authorize a state to sue in its *parens patriae* capacity for damages to its "general economy" because even a lengthy trial could not cope with the problems of double recovery. And in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court ruled that an indirect purchaser in a chain of distribution may not maintain a damage action against a seller for overcharges in violation of the Sherman Act passed on by the direct purchaser. Allowing every person along a chain of distribution to claim damages for a single transaction would risk duplicative recoveries; apportioning the damages would require massive evidence and overly complex damage theories, "discourag[ing] vigorous enforcement of the antitrust laws by private suits." *Blue Shield,* 457 U.S. at 474–475 n. 11, 102 S.Ct. at 2546 n. 11. Accordingly, the Court reasoned, to allow such suits would be "inconsistent with the broader remedial purposes of the antitrust laws." *Merican,* 713 F.2d at 964.

A second type of limitation, more central in the Supreme Court's recent opinions, concerns the proximity of the antitrust injury alleged and the harm suffered by the plaintiff. In an inquiry analogous to the proximate cause question in tort liability, courts must determine whether the injuries claimed by a plaintiff are "too remote from the alleged violation" to justify allowing treble damages recovery. *Blue Shield,* 457 U.S. at 477, 102 S.Ct. at 2547. As with proximate cause, this question cannot be

answered by application of a bright-line rule:

> In both situations the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will govern in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

*Associated General Contractors,* 459 U.S. at 536–537, 103 S.Ct. at 908; *see Bravman v. Bassett Furniture Industries,* 552 F.2d 90, 99 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977).

In *Associated General Contractors,* the Supreme Court identified the critical factors to be examined in this type of inquiry, including "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* 459 U.S. at 535, 103 S.Ct. at 907.[4] In addition, the Court weighed in the balance the interest in avoiding the risk of duplicative recoveries or unmanageable damage theories, as in *Illinois Brick.*

### III.

Application of the factors[5] in *Associated General Contractors* and *Illinois Brick* suggests that Gregory is not an appropriate party to assert the claim set forth in the present lawsuit. Although allegedly Gregory has been injured by Red Cheek's conduct and Red Cheek has engaged in anticompetitive practices, Gregory's injury did not result from the anticompetitive nature of these practices.

Gregory does point to certain factors that support allowing it to maintain a suit. As in *Associated General Contractors,* the complaint asserts a causal connection between the alleged antitrust violation and the harm to the broker; it also avers an intent to harm. But neither causation in this but-for sense nor an allegation of improper motive is sufficient to "enable any complaint to withstand a motion to dismiss." *Id.* at 537, 103 S.Ct. at 908.

It is also crucial to focus on the nature of Gregory's injury, since "in each case [the] alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." *Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. at 909. In that case, trade unions sued an association of contractors, claiming that the association improperly narrowed the market for construction contracting and subcontracting. The unions, however, were neither competitors nor consumers in that market, and their injury did not result from the alleged restraint of the market. The Supreme Court consequently determined that the union had suffered no antitrust injury.

The antitrust violation alleged by Gregory grows out of the pricing agreement between Wakefern and Red Cheek. This agreement, it is argued, may lead to reduced competition in the apple juice market, a result the Robinson-Patman Act was intended to prevent. But Gregory is neither a consumer nor a competitor in the apple juice market, and thus is not "within that area of the economy ... endangered by [the] breakdown of competitive conditions...." *Blue Shield,* 457 U.S. at 481,

---

**4.** This inquiry has sometimes been referred to as a question of antitrust standing, but the doctrine of standing in the antitrust context differs from standing in the constitutional sense. *Associated General Contractors,* 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.; see* Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 813 n. 11 (1977).

**5.** None of the Supreme Court's antitrust standing cases involved alleged violations of the Robinson-Patman Act. However, those cases interpret § 4 of the Clayton Act, the same provision governing Gregory's standing to bring suit in this case, and we thus apply the general principles developed in the Sherman Act cases in light of the particular law creating the substantive antitrust violation. *See, e.g., Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 210–211 (3d Cir.1980).

102 S.Ct. at 2549 (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973)).[6]

Gregory seeks damages for two distinct injuries, diminution of future income resulting from its loss of the Red Cheek contract, and reduced commissions received on discounted sales to Wakefern. The lost future income clearly does not flow from decreased competition in the apple juice market. That injury was inflicted by Red Cheek's termination of Gregory's contract.

Similarly, the reduced profit on commissions, although it resulted from the Red Cheek-Wakefern agreement, was not caused by the anticompetitive nature of that agreement. If Red Cheek had reduced its prices for all buyers, for example, Gregory would still have lost commissions, but there would have been no antitrust violation. Conversely, if Red Cheek had provided Wakefern with special discounts, but simply absorbed the loss itself and neither told Gregory nor demanded that the broker fabricate an explanation for other customers, the agreement would be equally anticompetitive, but Gregory would have suffered no injury. *See Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1169 (7th Cir.1978); *Haff v. Jewelmont Corp.,* 594 F.Supp. 1468, 1477 (N.D. Cal.1984).

Gregory argues that *Blue Shield* substantially weakens the importance of the burden on plaintiffs to show that their injuries reflect the "anticompetitive effect" of the violation. *Blue Shield,* however, cannot be read as broadly as the appellant endeavors to do. There, the plaintiff charged that Blue Shield purposefully pursued an anticompetitive scheme, by inducing its subscribers to select psychiatrists rather than psychologists for psychotherapy services. Denying reimbursement to individuals such as the plaintiff, who was treated by a psychologist, "was a necessary step in effecting the ends of the alleged illegal conspiracy," *id.* 457 U.S. at 479, 102 S.Ct. at 2548, and "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. at 2551.

Here, by contrast, Gregory's participation was not essential to carrying out the alleged anticompetitive agreement between Red Cheek and Wakefern. Red Cheek could have effected the discounts without even notifying Gregory. And while the plaintiff in *Blue Shield* was a consumer of psychotherapy services, Gregory was simply a broker, whose own profits would not necessarily be reduced by diminished competition. *Blue Shield,* therefore, does not excuse Gregory's failure to demonstrate an antitrust injury.

Nor are we persuaded by the rationale of *Ostrofe v. H.S. Crocker Co., Inc.,* 670 F.2d 1378 (9th Cir.1982) (*Ostrofe I*), *vacated and remanded in light of Associated General Contractors,* 460 U.S. 1007, 108 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand,* 740 F.2d 739 (9th Cir.1984) (*Ostrofe II*), *cert. dismissed,* —— U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), that Gregory has suffered an antitrust injury. In that case, the Ninth Circuit permitted a suit alleging a Sherman Act violation to be brought by a former marketing director of a company who was discharged for refusing to carry out a bid-rigging scheme. That view has generally been rejected in similar cases by other courts. *See, e.g., In re Industrial Gas Litigation,* 681 F.2d 514, 519 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983); *McNulty v. Borden,* 542 F.Supp. 655 (E.D.Pa.1982); *Callahan v. Scott Paper Co.,* 541 F.Supp. 550 (E.D.Pa.1982). *Contra Shaw v. Russell Trucking Line,*

---

**6.** Section 1 of the Robinson-Patman Act, an amendment to the Clayton Act, was enacted in 1936 in response to growing evidence that large chain buyers were using their greater purchasing power to obtain preferences over smaller independent stores. *Federal Trade Comm. v. Henry Broch & Co.,* 363 U.S. 166, 174, 80 S.Ct. 1158, 1163, 4 L.Ed.2d 1124 (1960). Commentators have concluded that concern with the impact of these discounts on the independent retailers, so-called secondary-line discrimination, "was in fact the principal impetus to enactment of the 1936 amendments." R. Posner & F. Easterbrook, Antitrust 943–944 (2d ed. 1981).

*Inc.,* 542 F.Supp. 776 (W.D.Pa.1982). Even were we to adopt the Ninth Circuit rule as to employees, it would not affect the outcome here. Analogizing to *Blue Shield,* *Ostrofe II* relied heavily on the fact that the marketing director was an "essential participant" in the price-fixing scheme, which "could not succeed without his active cooperation." *Ostrofe II,* 740 F.2d at 745–746. As noted above, however, this rationale is not applicable here since Gregory was not essential to the Red Cheek-Wakefern arrangement. Thus, *Ostrofe II* does not support Gregory's argument that it has sustained an antitrust injury.

That the Robinson-Patman Act encompasses potential impact on competition, as the dissent notes, does not assist Gregory in seeking to demonstrate antitrust injury. The problem with Gregory's complaint, under the foregoing analysis, is not that it asserts injuries resulting from potential rather than actual anticompetitive effects, but rather that the injuries it alleges do not result from anticompetitive market impact of either kind. In implicit acknowledgement of this failing, the dissent now sets forth a theory not previously advanced in this litigation: that the Red Cheek-Wakefern agreement might lead to decreased competition in the *brokerage* market in which Gregory competes, which, in turn, could damage Gregory. Even if such "intermediary" market effect came within the scope of the antitrust laws, there is no basis in the pleadings in this case for finding that there might be such an impact on Gregory. Neither in its complaint nor in its oral argument and memoranda in the district court and in this court did Gregory ever suggest that the price discrimination under challenge would, as the dissent hypothesizes, "lessen competition in the intermediary market in which it competes." Post at 100. Ordinarily, an appellate court is reluctant to consider arguments not raised in a party's brief or at oral argument. *See Publishers Resource v. Walker-Davis Publications,* 762 F.2d 557, 560 (7th Cir.1985). In any event, the dissent's theory of antitrust injury is not only speculative; in fact, Gregory disavowed it

before the district court, stating that it is "neither a consumer nor a competitor in *any market* of the economy relevant to this action...." App. at 22 (emphasis added).

Along with causation and the nature of the plaintiff's injury, a third factor considered under *Associated General Contractors* is the directness or indirectness of the injury alleged. In this case, Wakefern's competitors felt the effects of the injury most directly, while Gregory occupied only an incidental role in the alleged anticompetitive scheme. Wakefern's competitors, then, would be the most likely parties to sue. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public in enforcement diminishes the justification for allowing a more remote party to serve as private attorney general." *Id.* 459 U.S. at 542, 103 S.Ct. at 910.

Consideration of the policies of *Illinois Brick* and *Standard Oil* against allowing lawsuits that raise the risk of duplicative damage awards or excessive complexity, while not a primary concern here, provides additional reason for not permitting Gregory's suit. Gregory's own argument illustrates the problem: it contends that while it would recover for lost commissions and future profits, Wakefern's competitors could seek damages for sales lost as a result of the antitrust violation, and consumers could assert claims based on higher prices paid for products. Recognition of all of these claims, however, would require joinder of the potential plaintiffs to deal with problems of multiple litigation and liability, greatly complicating the trial. *See Illinois Brick,* 431 U.S. at 740, 97 S.Ct. at 2071. It is true that this case does not present the precise problem of calculating "pass-on" damages along a chain of distribution as in *Illinois Brick.* However, we believe the Supreme Court's concern not to add "whole new dimensions of complexity to treble-damage suits" that would "seriously undermine their effectiveness," *id.* at 737, 97 S.Ct. at 2070, is applicable here as

well, and bolsters the other factors weighing against allowing Gregory's lawsuit.

Finally, we come to Gregory's contention that, even if it has not met the criteria established in *Associated General Contractors,* its suit should be permitted in order to promote vigorous enforcement of antitrust violations. This theory draws on an alternative holding in *Ostrofe II,* which stated that following a suit by an employee discharged for refusing to cooperate in an antitrust violation "encourages exposure of such schemes by persons best situated to know of their existence." *Id.* at 747. Even if the plaintiff has not sustained an antitrust injury in the "technical sense," Gregory argues, the suit should be permitted because "it is unlikely that any other victim with knowledge of the conspiracy sustained a kind of injury that would give him equal incentive to bring the antitrust violators to account." *Ostrofe II* at 747.

While we agree that effective antitrust enforcement is a salutary goal, we cannot accept Gregory's argument. The treble damages remedy of § 4 is an extraordinary one, and must be carefully confined within reasonable limits. Indeed, the judicial doctrine limiting the class of possible § 4 plaintiffs " 'acknowledges that while many remotely situated persons may suffer damage in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of [someone] who is an immediate victim of the violation,' and that 'if the flood-gates were opened to permit treble damage suits . . ., the lure of a treble recovery . . . would result in an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress.' " *Mid-West Paper Products Co. v. Continental Group,* 596 F.2d 573, 587 (3d Cir.1979), (quoting *Calderone Enterprises, Inc. v. United Artists Theatre Circuit,* 454 F.2d 1292, 1295–1296 (2d Cir.1971)), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Allowing Gregory to maintain this suit, we believe, could lead to just this type of excess.

### IV.

We do not take lightly claims that a manufacturer has engaged in the kind of conduct alleged here by Gregory, nor are we unsympathetic to the plight of a broker whose contract allegedly has been terminated for refusing to assist in price discrimination it believes to be unlawful. However, New Jersey law provides a remedy for breach of contract, and we believe that such an action, rather than a lawsuit under the Clayton Act, is the appellant's appropriate recourse. The judgment of the district court will be affirmed.

GIBBONS, Circuit Judge, dissenting:

Gregory Marketing Corp. is engaged in interstate commerce as an independent food broker, acting as a sales intermediary between primary line food packagers and food retailers. Its business is separate from and independent of both the food packagers it represents and the food retailers to which it sells. Gregory alleges that a food retailer, Wakefern Food Corp., to whom it sold products packaged by a primary line food packager, Red Cheek, Inc., went behind Gregory's back and exacted from that packager a discriminatory price discount in violation of section 2(a) of the Clayton Act, as amended by section 1 of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1982). There is no question that the facts alleged amount to a violation of that Act, and the majority does not suggest otherwise.

Gregory's complaint seeks money damages, and "such further relief as this Court may deem just and equitable." Joint Appendix 6–7. Fairly read, however, it does not seek injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26 (1982). It pleads reliance only on section 4 of the Clayton Act, 15 U.S.C. § 15 (1982). Thus the majority's affirmance of the district court's dismissal of Gregory's complaint for lack of standing does not reach the question whether an intermediary in a chain of distribution would have standing to seek injunctive relief against violations of the Robinson-Patman Act. If that ques-

tion were to arise, I assume that it would be controlled by *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 589–94 (3d Cir.1979). I read the majority opinion, therefore, only as an interpretation of section 4 of the Clayton Act, which authorizes recovery of money damages.

Of course, those cases that interpret section 4 to be limited by judge-made standing rules of necessity also interpret to some extent the substantive antitrust laws that establish the appropriate standard of conduct in the marketplace and give rise to the underlying violation. Thus section 4 standing has been held to vary depending on whether the antitrust law that has been violated is one aimed at potential or actual injury to competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Like section 7 of the Clayton Act, 15 U.S.C. § 18 (1982), which was the section dealt with in *Brunswick,* section 2(a) of the Clayton Act is a prophylactic statute. A violation can be proved by the mere showing that the effect of the targeted conduct may be to substantially lessen competition. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 561, 101 S.Ct. 1923, 1926, 68 L.Ed.2d 442 (1981).

Because the interpretation of section 4 varies depending upon the substantive law underlying the plaintiff's claim, it seems appropriate to consider what areas of competition are intended to be protected by the substantive law relied upon in this case. The Robinson-Patman Act was adopted by Congress in 1936 specifically as an effort to curb the market power possessed by chain retailers such as Wakefern Corp.[1] Section 1 of the Robinson-Patman Act, however, was only enacted as an amendment to section 2 of the Clayton Act. *See*

ch. 323, § 2, 38 Stat. 730, 730–31 (1914), as amended by the Robinson-Patman Act, ch. 592, § 1, 49 Stat. 1526, 1526–28 (1936) (current version at 15 U.S.C. § 13(a)–(f) (1982)). Section 2 of the Clayton Act had the much broader purpose of prohibiting those predatory pricing practices that were injurious to competition at any level.[2] Thus section 2 forbade price discrimination "where the effect . . . may be to substantially lessen competition or tend to create a monopoly *in any line of commerce."* 38 Stat. at 730. The Robinson-Patman Act carried forward from the 1914 statute the italicized language *"in any line of commerce."* *See* 15 U.S.C. § 13(a). Thus section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, prohibits price discrimination "where the effect . . . may be substantially to lessen competition . . . in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly received the benefit of such discrimination or with customers of either of them. . . ." *Id.*

Consistent with its plain language, courts have construed the statute to be aimed at protecting competition at all levels: primary, secondary, and tertiary. Long before the 1936 amendment the Supreme Court had observed, "The phrase is comprehensive and means that if the forbidden effect or tendency is produced in *one* out of *all* the various lines of commerce, the words 'in *any* line of commerce' literally are satisfied." *Van Camp & Sons Co. v. American Can Co.,* 278 U.S. 245, 253, 49 S.Ct. 112, 113, 73 L.Ed. 311 (1929) (rejecting construction that section 2 only protected primary line competition between the discriminator and its competitors). Since the 1936 amendment the Supreme

1. *See Federal Trade Comm'n v. Morton Salt Co.,* 334 U.S. 37, 43, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948); H.R.Rep. No. 2287, 74th Cong., 2d Sess. (1936); S.Rep. No. 1502, 74th Cong., 2d Sess. (1936); Federal Trade Commission, Final Report on the Chain-Store Investigation, S.Doc. No. 4, 74th Cong., 1st Sess. (1935); C. Austin, *Price Discrimination and Related Problems under the Robinson-Patman Act,* 8–11 (2d rev. ed. 1959); J.

Palamountain, *The Politics of Distribution,* 188–234 (1955); Rows, *The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective,* 57 Colum.L.Rev. 1059 (1957); Report of the Attorney General's National Committee to Study the Antitrust Laws, 155–56 (1955).

2. *See* H.Rep. No. 627, 63d Cong., 2d Sess. 8 (1914).

Court has reconfirmed this broad interpretation of the statute. *See, e.g., Federal Trade Commission v. Anheuser Busch, Inc.,* 363 U.S. 536, 543–45, 80 S.Ct. 1267, 1271–72, 4 L.Ed.2d 1385 (1960) (competitors of the discriminating seller are protected).

Gregory is engaged in commerce as a food broker. As such it competes with others in the economy who actually and can potentially perform the same intermediary function that it performs. The discrimination of which Gregory complains has an effect upon retail level competitors of Wakefern Corp. It has an effect on food processor level competitors of Red Cheek, Inc. It also has an effect upon Gregory. The complaint alleges that while the discrimination was going on unknown to Gregory, Gregory was deprived of commission revenue, and that if Gregory would have continued to countenance it there would have been further revenue losses.

Whether that deprivation of revenue at the intermediate level of distribution is one that is likely to lessen competition or to tend to create a monopoly in Gregory's line of commerce is not a matter that can be decided on the pleadings. Certainly under the complaint Gregory could attempt to prove that the price discrimination of which it complains would have the tendency to substantially lessen competition in the intermediary market in which it competes. For example, Gregory could attempt to prove that in order to sustain the price discrimination over time the manufacturer would be likely to take over the distribution function that Gregory performed, thereby eliminating it as a competitor in the intermediate market.

The majority, although focusing upon section 4 rather than section 2(a) of the Clayton Act, seems implicitly to hold that Gregory is not within the zone of protection of the latter section. The opinion notes that "Gregory is neither a consumer nor a competitor in the apple juice market, and thus is not 'within that area of the economy ... endangered by [that] breakdown of competitive conditions'." Typescript at 95 (quoting *Blue Shield of Virginia, Inc. v. McCready,* 457 U.S. 465, 480–81, 102 S.Ct. 2540, 2548–49, 73 L.Ed.2d 149 (1982)). The majority is simply wrong. There is a potential for the breakdown of competitive conditions at the intermediary level in the chain of distribution of apple juice, and section 2(a) of the Clayton Act is as much concerned with that level as with the manufacturing or retail level. The majority's reference to Gregory not being a consumer is completely irrelevant for purposes of section 2(a) of the Clayton Act.

Unlike the majority, I start with the premise that Gregory is engaged in a line of commerce with which section 2(a) of the Clayton Act is concerned. Turning to the question whether section 4 should be interpreted as affording it the opportunity to seek relief, there are no reasons relevant to the antitrust laws suggesting that it should not be.

It is settled that a section 4 suit predicated upon a violation of section 2(a) of the Clayton Act requires proof of injury to business or property other than or apart from the amount of the price discrimination. *J. Truett Payne,* 451 U.S. at 561–63, 101 S.Ct. at 1926–1928. A primary line competitor of the discriminator must prove injury to its business or property. A retail level competitor must prove injury to its business or property. An intermediary in the chain of distribution must prove injury to its business or property. None of these competitors can recover damages that the others might recover. The suggestion by the majority that there is a possibility of duplicate recovery, therefore, is simply false. This case is not at all like *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which involved increased prices arguably passed through to consumers. No consumer purchasing from Wakefern Corp. could show an injury to business or property from being charged less than he would otherwise be charged. No retail competitor of Wakefern could recover the damages incurred by Gregory. No apple juice manufacturer could recover the damages incurred by

Gregory or by Wakefern's retail competitor. In sum, the majority's suggestion that these parties would have to be joined in Gregory's section 4 lawsuit is utterly fanciful.

The majority's reliance on the "indirectness" of Gregory's injury is equally misplaced. The complaint alleges two injuries that in a proximate cause sense are as direct as they can be: lost revenue which presumably translates into lost profits, and lost opportunity to continue as an intermediary in the apple juice market.

Gregory pleads that it has a business interest entirely separate from any other potential plaintiff. It alleges, and at the pleading stage we must assume it can prove, proximate cause between Wakefern's inducement of a section 2(a) violation and an injury to its business. Permitting Gregory to recover presents no problem of duplicate recovery because each potential plaintiff must satisfy the actual injury test announced in *J. Truett Payne*, 451 U.S. at 561–63, 101 S.Ct. at 1926–27. Gregory's proof of damages will be no more complex than would be the proof of damages required by any other potential primary line or retail level plaintiff. Of all the potential plaintiffs who may have been injured by the violation of section 2(a), Gregory has perhaps the strongest incentive for enforcement. All these factors suggest that Gregory should have section 4 standing.

The only factor arguably supporting the proposition that Gregory should not have standing is that section 4 damage remedies should never be used where the underlying substantive violation, while resulting in an actual injury to business or property, results only in a potential rather than actual injury to competition. It is well-settled, however, that violations of section 2(a) do support section 4 recovery in cases where the plaintiff is in the zone of interest protected by that section and can show injury to business or property from the violation. *See Jefferson County Pharmaceutical Association, Inc. v. Abbott Laboratories*, 460 U.S. 150, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983); *J. Truett Payne. Co., Inc. v. Chrys-*

*ler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923 (1981); *Utah Pie Co. v. Continental Baking*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967).

The majority in this case has ignored the plain language of section 2(a), which protects potential competition at all levels of distribution. Its analysis of section 4 standing is an unfortunate retrogression to the bad old days when this court used "standing" as a means of shutting the door on private antitrust enforcement for reasons which were essentially subjective and concealed. I had hoped that *Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501, 508 (3d Cir.1976), had signalled the end of that era.

The order dismissing Gregory's complaint for lack of standing should be reversed.